. No. 40,265

STATE OF KANSAS, ex rel. HAROLD R. FATZER, (JOHN ANDERSON, JR., substituted), as Attorney General of the State of Kansas, *Plaintiff*, v. A. E. ANDERSON, HOWARD BENTLEY, CLYDE LITTLER, DALE E. SAFFELS, DONALD S. HULTS, C. L. HUXMAN and R. C. WOODWARD, as Members of the Pretended Legislative Investigating Committee Created Pursuant to House Joint Resolution No. 1, Budget Session of 1956; R. T. FADELY, State Treasurer, and ROY SHAPIRO, Controller of State, *Defendants*.

(299 P. 2d 1078)

Opinion filed June 30, 1956.

*John Anderson, Jr.*, attorney general, argued the cause, and *Paul E. Wilson, Robert E. Hoffman*, and *Robert J. Roth*, assistant attorneys general, were with him on the briefs for the plaintiff.

W. D. *Jochems* and *George Stallwitz*, both of Wichita, argued the cause and *W. F. Lilleston*, of Wichita, was with them on the briefs for the defendants.

The opinion of the court was delivered by

SMITH, C. J.: This is an original action in quo warranto wherein the state on the relation of the attorney general seeks to oust a committee of the legislature from carrying out powers purporting to be conferred on it by a resolution of the budget session of 1956 and to oust the members of the committee and each of them as members of the committee and the state treasurer and controller of the state from expending or disbursing any funds pursuant to the resolution.

The case reaches us on the second amended petition. It alleged the defendants, Anderson, Bentley, Littler, Saffels, Hults, Huxman and Woodward were members of the pretended committee created pursuant to House Joint Resolution No. 1, Budget Session of 1956; that Fadely and Shapiro were the state treasurer and controller; that pursuant to Section 25 of Article 2 of the State Constitution, as amended by the people at the general election of 1954, the legislature assembled at the state capitol on January 19, 1956, for the purpose of holding a budget session, as contemplated by Section 25 of Article 2; that while so assembled the legislature did purport to enact House Joint Resolution No. 1 creating the pretended legislative investigating committee as an interim committee to meet and investigate other agencies of the state government during the period between the sine die adjournment of the 1956 budget session and the convening of the regular session of 1957; that the defendant members of the committee were purporting to act in their capacity as members of the investigating committee and were about to assume and exercise the powers purported to be granted House Joint Resolution No. 1.

The amended petition then alleged the resolution was unconstitutional and void because it violated Section 25 of Article 2 for the reason it was enacted for a purpose aside from and in excess of the matters to which the above section limited the budget session; that Section 25 of Article 2, provided in pertinent part that the legislature shall meet in budget sessions of not to exceed thirty calendar days duration in each even numbered year, commencing with the year 1956, at which budget session "the legislature shall consider only the governor's budget report, appropriation bills

for the succeeding fiscal year, revenue bills necessary therefor, and such bills, resolutions or motions as may be necessary to provide for the expenses and conduct of the budget session."

The amended petition further alleged the legislature while assembled in its budget session of 1956 was without power to create during that session a continuing committee to exercise any of the powers of the legislature after adjournment of the budget session; that the power of the defendant members of the committee to act as members of the senate and house of representatives terminated with the sine die adjournment of the 1956 budget session, and after that date the defendants were without power to exercise any inherent or delegated powers incidental to their official positions, or to perform any of the acts purported to be authorized by House Joint Resolution No. 1.

The amended petition further alleged that the resolution was unconstitutional because it purported to grant pay to the members of the legislature purporting to act in their legislative capacities beyond the limitations imposed by Article 2, Section 25, of the Constitution; that the pay provided for in the resolution was in excess of the sum allowed by Article 2, Section 3, of the Constitution, all members of the committee having received and having been paid to the full extent their allowable pay for the 1955 session and the budget session of 1956; that the resolution was an attempt to extend the life and power granted the 1956 budget session beyond the thirty days to which it is limited in violation of the express inhibition of Article 2, Section 25; that House Joint Resolution No. 1, as introduced in the house of representatives in January, 1956, was not an "appropriation bill for the succeeding fiscal year" nor was it a "revenue bill necessary therefor" nor a "bill, resolution or motion as may be necessary to provide for the expenses and conduct of the budget session" nor a part of the "governor's budget report"; that on January 30, 1956, the state senate amended House Joint Resolution No. 1 to include Section 7, purporting to appropriate from the state general revenue fund the sum of $75,000 for the purpose of carrying out the unlawful powers purported to be authorized by the remaining provisions of the resolution and the resolution as so amended was passed by the senate on the 30th day of January, 1956; that the resolution as amended was concurred in by the house on January 31, 1956, signed by the governor on February 7, 1956, and duly published; that the resolution as amended was un-

constitutional and void for the further reason that it contained more than one subject in violation of Section 16 of Article 2, of the Constitution, which provides in part "No bill shall contain more than one subject."

The amended petition then alleged there was no need for the committee for the reason that the powers purportedly imposed upon it were fully provided for in Chapter 46, Article 2, General Statutes of 1949, which authorized the legislative council to perform all the duties purported to be conferred upon it; that the resolution provided for a duplication of the functions conferred by law on the council; that an appropriation of $75,000 was made by the 1956 budget session to the council for the purpose of carrying on within the provisions of that law such investigating procedures as were deemed necessary by the Kansas legislature for further budgeting purposes.

The amended petition further alleged that Shapiro and Fadely would unless ousted from so doing disburse funds belonging to the state, pursuant to orders of the defendant committee under the purported authority of the resolution.

The prayer was as already set out in this opinion.

To this amended petition the defendants demurred on the ground that it did not state facts sufficient to constitute a cause of action in favor of the plaintiff and against defendants.

House Joint Resolution No. 1, as amended by the senate and concurred in by the house, will be found attached to this opinion as Exhibit B.

The action arises out of the activities of the first session of our legislature to take place following the adoption by the people of an amendment to our constitution submitted to them at the general election of 1954.

Prior to that time our legislature had since 1877 met biennially except when called in session by the governor "on extraordinary occasions" pursuant to Article 1, Section 5 of the Constitution. Article 2, Section 25, of the Constitution prior to the adoption of the recent amendment provided as follows:

"All sessions of the legislature shall be held at the state capital, and beginning with the session of eighteen hundred and seventy-seven, all regular sessions shall be held once in two years, commencing on the second Tuesday of January of each alternate year thereafter."

The amendment to that section pursuant to which the legislature met for the 1956 budget session provides as follows:

"All sessions of the legislature shall be held at the state capital, and beginning with the session of eighteen hundred and seventy-seven, all regular sessions shall be held once in two years, commencing on the second Tuesday of January of each alternate year thereafter. Beginning with the year 1956, budget sessions of not to exceed thirty calendar days in duration shall be held, commencing on the second Tuesday in January, and each even-numbered year thereafter, at which the legislature shall consider only the governor's budget report, appropriation bills for the succeeding fiscal year, revenue bills necessary therefor, and such bills, resolutions or motions as may be necessary to provide for the expenses and conduct of the budget session."

The question with which we are concerned is whether House Joint Resolution No. 1, already referred to in this opinion, is beyond the power conferred on the legislature by the provisions of the above amendment. Briefly stated, the resolution provided for the creation of what it denominated an investigating committee and directed it to investigate in such manner as it should deem advisable any official, officer, board, commission, agency or department of the state government, or the conduct in office of any officer or employee in any office, board, commission or department of the state government or any other matter, including but not by way of limitation, the number of state employees, the necessity of the purchase, sale or use of all materials, supplies, facilities and services by the state. The resolution contained a section appropriating $75,000 to pay the expenses of carrying on the work of the committee.

At the outset certain sections of our General Statutes will be noted so as to clarify the use of the phrases "budget session" and "governor's budget report" in the amendment.

The legislature at the regular session of 1953 by Chapter 375 created the state department of administration. The act established a uniform system of accounting, disbursing and auditing of state funds. One department was the budget division created by Sections 15 to 27 of Chapter 375. The duties of the budget director were provided in Section 15, Subparagraphs 3 and 4, as follows: (3) Prepare under the supervision of the incoming governor the budget report for submission to the legislature and (4) prepare a legislative measure or measures reflecting the incoming governor's budget.

Section 20 provided:

"After the incoming governor has had an opportunity to review, amend and approve the tentative budget, it shall be known as the governor's budget report. The budget director shall cause the governor's budget report to be printed within three weeks after the convening of the regular legislative session and

copies thereof shall be presented to each member of the legislature and made available to the public."

Also, the first provision of Section 21 is as follows:

"Within three weeks after the regular legislative session convenes, the incoming governor shall submit his budget report to the legislature."

Section 1, Subsection 8 of Chapter 375, Laws of 1953, provides "regular legislative session" means a regular session required by the constitution to meet in the odd-numbered years and sessions of the legislature required to meet in the even-numbered years for the purpose of considering the governor's budget report.

The present amendment had not been submitted at that time. It was submitted at that session by Senate Concurrent Resolution No. 1. It was adopted by the people at the general election of 1954. It seems clear from all these things and from a reading of Chapter 375, Laws of 1953, that the legislature intended the act to provide centralized control of state funds, with budgeting of such funds on an annual basis.

At any rate, the resolution amending Article 2, Section 25 borrowed from Chapter 375 the phrase "budget session" and "governor's budget report." The two events came so quickly, one on the heels of the other, that it can scarcely be denied the legislature was thinking of the provisions of the act when preparing the resolution. A discussion and consideration of the questions involved in this case can hardly intelligently be accomplished without pointing out the wide, sweeping and exhaustive authority the budget department has over the expenditures and prospective expenditures of various state agencies. One can hardly imagine any information available to a legislative committee which has not already been made available to the budget department and through the governor's budget report to the legislature.

In the progress through the years of the written constitutions of the states certain definite rules have materialized. One with which we are interested here is, state constitutions limit rather than confer powers. In *Hunt v. Eddy*, 150 Kan. 1, 90 P. 2d 747, we said:

"It is fundamental that our state constitution limits, rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby." (p. 4.)

See, also, *Lemons v. Noller*, 144 Kan. 813, 63 P. 2d 177; *Sumner County v. Wellington*, 66 Kan. 590, 72 Pac. 216; also *State ex rel. Robinson v. Fluent*, 30 Wash. 2d 194, 191 P. 2d 241.

Our state, along with other states, has followed the system of the three departments of government, that is, the executive (Article 1, Section 1); the legislative (Article 2, Section 1) and the judicial (Article 3, Section 1). Each of these departments is supreme in its field. At the same time there are definite limitations on each. For instance, the governor may veto a bill passed by the legislature. (Article 2, Section 14.) On the other hand the legislature may by a vote of two-thirds of the members pass it over his veto.

Certain limitations on the power of the legislature have been in the constitution from the beginning. The time of meeting and the length of time the legislature should remain in session has always had the attention of the people. The Wyandotte Constitution provided in Article 2, Section 25:

"All sessions of the legislature shall be held at the state capital, and all regular sessions shall commence annually on the second Tuesday of January."

By the terms of Article 2, Section 2, representatives were elected for terms of one year and senators for two years. It was provided that the governor might on extraordinary occasions convene the legislature by proclamation and that he must before the commencement of every session communicate in writing such information as he might possess in reference to the condition of the state. (Article 1, Section 5.)

It is clear from these two sections the only time the legislature might meet was on the second Tuesday of January and when called by the governor on an extraordinary session. This seems clear when we note that Article 2, Section 3, put a limit of three dollars per diem on the pay of a legislator and in the aggregate not more than $150 for a regular session and $90 for a special session. Clearly the idea of the founding fathers was that the legislature should be limited as to the length of time for sessions.

In 1875 the legislature submitted an amendment to Article 2, Section 25. It provided all sessions of the legislature shall be held at the state capital and beginning with the session of 1877 all regular sessions shall be held once in two years commencing on the second Tuesday of January of each alternate year. At the same election Article 2, Section 29 was adopted, which provided for representatives being elected for two years and senators for four years. From 1877 until 1956 the regular sessions were held every two years beginning on the second Tuesday of January of every odd-numbered year. Without the constitution there would have been

no legislature. The legislature could only meet once in each two years unless called into session by the governor on an extraordinary occasion. The legislative article of the constitution is full of limitations in its power. Since 1873 the number of representatives shall be 125, of senators 40. Each county must have at least one representative. (Section 2.) Until recently the pay could not be more than three dollars a day and not more than $150 for a regular session (Section 3); every bill must be read on three separate days in each house unless in emergency; two-thirds majority is necessary to suspend the rules (Section 15); no bill may contain more than one subject (Section 16); all laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable no special law shall be enacted; and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state (Section 17). (The latter provision of the above section was submitted by the legislature of 1905. This section has been the subject of much litigation); the legislature may not grant divorces (Section 18); all acts must be published (Section 19); the enacting clause of all laws must be "Be it enacted by the legislature of the state of Kansas" (Section 20); in providing for schools the legislature may not make any distinction between the rights of males and females (Section 23); no money shall be drawn from the state treasury except in pursuance of a specific appropriation made by law and no appropriation may be for a longer time than two years. (Section 24)

It will be realized the framers of the constitution have had in mind certain well-defined limitations within which the legislature was confined in its activity. There were undoubtedly certain evils it was sought to prevent, such as denying to the legislature the power to grant divorces, enacting special legislation, increasing the pay of members; staying sessions for long periods of time; enacting laws without publishing them; and changing the apportionment of members so as to shift control of the house to the more populous centers.

When interpreting or construing a constitutional amendment we must examine the language used in it and consider that, in connection with the general surrounding facts and circumstances that caused the amendment to be submitted. We have already demonstrated how the amendment happened to be submitted in order to enable the legislature to legislate more nearly in harmony with

Chapter 375 of the Laws of 1953. We have demonstrated the problem of governmental financing which it was hoped Chapter 375 would help solve. There remains the question of the meaning of the language used in the light of these considerations.

In the first place, the original language of the 1875 amendment is left intact. Then the amendment speaks of "budget session." The same session had in the enactment of Section 1, Subsection 8, of Chapter 375 provided that for the purpose of that chapter the words "regular session" should mean the regular session as it then existed and the "budget session" not then provided for. This is persuasive to us that the legislature had in mind a session as had existed since 1877, and the budget session as it was to be created, as distinguished from a session called by the governor on an extraordinary session. At any rate, the term "budget session" came into our legal terminology at the session of 1953. Had the legislature intended that there should be no distinction between the session in the even-numbered years, and that in the odd-numbered it could very easily have provided that the legislature should meet every January. It did not do this, however. From the first provision of the amendment it placed limitations on the new session. The next phrase put a further limitation. The new session should be only thirty calendar days in duration. The Wyandotte Convention had attempted to meet this by limiting the pay to $150 for a regular session. The legislature of 1953, however, provided definitely that the session should be in session for thirty days only and to render it unambiguous provided further these should be calendar days and that Sundays and holidays were not included as legislative days, as might have been argued.

Next is the word "consider." This word is often used in legal parlance. It has a rather definite meaning. It denotes as little positive action as any word that could have been used. The amendment did not say the legislature should not "enact" or should not "recommend." It said the legislature should not even "consider," "talk about," "discuss," or "give its attention to anything other than the governor's budget report." Then we find the word "only." "Only" is a word used for restrictive purposes. Such is the commonly understood meaning. It is defined as meaning alone, simply, merely, barely, solely, singly without more exclusiveness. See *American College Dictionary, Random House* and *Williston's Twen-*

*tieth Century Dictionary.* In *Re Salhus,* 63 N. D. 238, 247 N. W. 401, the court said:

> "One of the changes was to insert the word 'only.' This must be presumed to have been done intentionally and the legislature must be presumed to have approved and passed the bill with the intention that the word 'only' should be given its usual ordinary meaning." (p. 240.)

See, also, *Uncas National Bank v. Superior,* 115 Wis. 340, 91 N. W. 1004, where the court said:

> "It is clearly a grant of power with a restriction. It has reference to the issue of general city bonds. It limits the authority to issue such bonds to the purposes stated. The language is clear and unambiguous, and must be interpreted or construed as it reads. The use of the word 'only' is clearly restrictive, and excludes as clearly as language can the idea that the council can issue general city bonds for purposes other than those expressed. No argument can break the force of language of such plain intent."

See, also, *Bacon v. Federal Reserve Bank,* 289 Fed. 513; also *Moore v. Stevens,* 90 Fla. 879, 106 So. 901. A legislature considers, or talks about, or studies many subjects on which it takes no action. This amendment provides, however, that the session meeting in the even-numbered years shall consider only four subjects, no more, that is, the governor's budget report, a subject which when that amendment was submitted had a definite, well-recognized meaning; appropriation bills for the succeeding fiscal year, a subject which had a definite meaning at that time; revenue bills necessary therefor and such bills, resolutions or motions as might be necessary to provide for the expenses and conduct of the budget session. A more restrictive amendment could hardly have been drawn. The governor's budget and the revenue bills and appropriations were intended to be the real business of the session. The other subjects are only incidental.

There remains then the question whether the consideration of this resolution came under any of the subjects the legislature was empowered to consider. Here we are not without some light from the authorities.

Defendants argue, the legislative consideration of proposed bills extends not only to discussion on the floors of the two houses but also to the investigation of the subject matter of committees, both during legislative sessions and after adjournment.

We have examined the authorities cited to sustain this argument. They all deal with the powers of a legislature meeting in a regular

session instead of a session, the scope of which is restricted, as is the one we are here considering. *In re Davis*, 58 Kan. 368, 49 Pac. 160, is cited and relied on by defendants. It, however, dealt with a resolution passed at a regular session and is not in point here.

There can be no doubt that a legislature may by committee at a regular session investigate any subject upon which it has power to legislate. We have demonstrated heretofore, however, the session at which House Joint Resolution No. 1 was passed was a restricted one. We are treating with the power of the legislature at a restricted session as distinguished from a general one.

There are two lines of authority. Some states have a provision for budget sessions such as ours. [See *Maryland Constitution*, Article 3, Section 15; *Constitution of Colorado*, Article 5, Section 7; *Louisiana Constitution*, Article 3, Section 8; *West Virginia Constitution*, Article 6, Section 22; and *California Constitution*, Article 4, Section 2 (a).]

The amendment to the Maryland Constitution provides as follows:

"In any of said thirty-day sessions in even years, the General Assembly shall consider no bills other than (1) Bills having to do with budgetary, revenue and financial matters of the State Government, (2) legislation dealing with an acute emergency, and (3) legislation in the general public welfare."

It will be noted the Maryland legislature was given the power to legislate on "acute emergencies" and the "general public welfare" as well as "budget matters."

In *Funk v. Mullen Contracting Co.*, 197 Md. 192, 78 A. 2d 632, the court said:

"It is apparent, therefore, that the main purpose of providing for 30-day sessions in the even years was to enable annual budgets to be submitted for the State Government, and that the amendment, while it did not wholly restrict these sessions to budgetary matters, did place certain restrictions upon the character of legislation which should be considered. This is a clear departure from the ordinary authority to consider, in the regular 90-day session, or in any special session, all matters that might properly be brought before the General Assembly, . . . *Section* 15 provides a new restriction upon the right of the Legislature to pass *any* legislation at the short even year sessions except that enumerated, or, perhaps a better way to express it is to say that it has no authority to pass any legislation at such sessions other than that enumerated."

To the same effect is *Wash. Sub. San. Comm. v. Buckley*, 197 Md. 203, 78 A. 2d 638.

In California the governor has power to limit, when calling a special session, the matters the legislature may treat at such session.

In *Special Assembly Int. Com. v. Southard,* 13 Cal. 2d 497, 90 P. 2d 304, the court treated the power of the legislature sitting in special session to appoint a committee to sit after the legislature had adjourned sine die.

In the Southard case, at page 503, the court stated:

". . . either by single house or concurrent resolution, the legislature may appoint committees and delegate to them the power of investigation, with the duty of reporting back to the body that appointed them . . . The resolution creating the committee purported to authorize the committee to sit after such adjournment, and to report back, not to the body that had appointed it, but to a new body, the thereafter to be elected assembly of the fifty-third session . . . When the power to legislate ceases, then the power to investigate for the purpose of aiding the legislature in exercising this power ceases, or stated another way, when the main power of legislating dies the incidental or implied power dies with it; that upon adjournment *sine die* the legislative powers of both houses of the legislature cease . . ."

In *Swing v. Riley,* 13 Cal. 2d 513, 90 P. 2d 313, in dealing with a similar question the court said:

"Article V, Section 9, of the Constitution provides that the legislature at special session 'shall have no power to legislate on any subjects other than those specified in the proclamation. . . .' This constitutes a prohibition against exercising legislative powers at a special session except in considering matters included within the call. The work of legislative committees is subsidiary and auxiliary to the legislative functions of each house. If the legislature cannot directly legislate on matters not included within the call, then it cannot exercise dependent or subsidiary powers derived solely from the direct power to legislate."

*Denver Co. v. Moss,* 50 Colo. 282, 115 Pac. 696, was a case where the court was considering the validity of legislation passed at a special session where scope of legislation had been limited. The court said:

". . . In regular session, the general assembly has the widest latitude, and is at liberty to act upon any question whatsoever, in any manner not in conflict with the state or federal constitutions, concerning which it has authority to legislate. . . . By the express terms of the constitution, the general assembly, in special session, can do no business whatever, except upon a subject specially named in the proclamation of the governor."

See, also, *Wells v. The Mo. Pac. Ry. Co.,* 110 Mo. 286, 19 S. W. 530, where the court said:

"When they have said, as in the language before us, that 'the general assembly shall have no power . . . in extra session . . . to act upon

subjects other than those specially designated,' etc., it is our duty to give effect to that statement. To hold that such language is merely directory would amount, in substance, to amending the instrument so as to import that the assembly should have no such power unless it assumed that power. Such a reading, we conceive, would reduce the command to a dead letter and virtually eliminate it. It is a reading we do not feel at liberty to adopt, however great the respect we entertain for the legislature."

*Ex Parte Wolters*, 64 Tex. Crim. Rep. 238, 144 S. W. 531, was a case where the legislature had been convened in a special session on the call of the governor to make appropriations and to apportion the state into senatorial districts. While so convened the house created an investigating committee to investigate irregularities in a prior election. The court held the act unconstitutional because it was beyond the scope of the call. The court said:

"It is thought to be a correct statement that the Legislature either in general or special session would have no authority either as a body or through committees to investigate matters for legislation about which that body could not enact laws, and when they were without authority to so enact." (p. 247.)

The court further stated:

"The only purpose for which that Legislature was called was to legislate on specified subjects. It was not authorized to collect data for future legislation, nor with a view of legislating upon any matter not submitted to them, and if it attempted to do so such attempt can not be termed legal proceedings of the House." (p. 251.)

See, also, *Annenberg v. Roberts, et al.*, 333 Pa. 203, 2 A. 2d 612 and *State v. Pugh*, 31 Ariz. 317, 252 Pac. 1018.

Not the least of the considerations we must weigh in deciding this question is the fact House Joint Resolution No. 1 was finally adopted on February 7, 1956. This was the 29th day of the 30th day budget session and the next to the last day upon which it, as a body, could legally exist. The committee appointed pursuant to it could not possibly carry on any investigations which would be of any benefit to that particular legislature. We are not called on to decide what would have been the power of the legislature acting in this budget session to appoint a committee in the first days of its existence to make an investigation.

We have already discussed in this opinion the history of the constitutional amendment and the history of Chapter 375 of the Laws of 1953. They must be considered together. When this is done the conclusion is inescapable that the legislature in preparing the amendment to submit to the people intended it to be restricted to budget matters.

No one would have the hardihood to argue that legislatures do not have general investigatory powers. However, such power is not absolute. See 81 C. J. S. 961, § 43. There it is said:

"Generally, however, the legislative power to investigate is not absolute, and it has been held to be limited to the obtaining of information on matters which fall within the proper field of legislative action."

Also, in *Opinion of the Justices*, 96 N. H. 530, 73 A. 2d 433, it is said:

"The legislative power to investigate is not absolute."

See, also, *Commonwealth v. Costello*, 21 Pa. Dist. 232, where the court said:

"It is to be observed, however, that the subject thus to be investigated must be one lying within the proper field of legislative action."

See, also, *People, ex rel. McDonald v. Keeler*, 99 N. Y. 463; 2 N. E. 615; also *McGrain v. Daugherty*, 273 U. S. 135; 47 S. Ct. 319; 71 L. ed. 580; and *United States v. Owlett*, 15 F. Supp. 736.

The amendment as submitted to the voters on a ballot is as follows:

"The legislature shall hold regular budget sessions in the even numbered years of not to exceed 30 calendar days beginning in 1956."

Certainly no voter would read this ballot and have the idea that he was voting for a session that would have unlimited powers.

Judgment is entered for the platintiff ousting defendant members of the investigation committee from carrying out the powers purported to be granted by House Joint Resolution No. 1, Laws of Budget Session of 1956, and ousting defendants and each of them as members of the investigating committee and the state treasurer and controller of state from expending or disbursing or otherwise obligating any money of the state pursuant to the purported authority of House Joint Resolution No. 1, Laws of the Budget Session of 1956.

FATZER, J., not participating.

## APPENDIX

### "EXHIBIT 'B'

### "HOUSE JOINT RESOLUTION No. 1

"A JOINT RESOLUTION making an appropriation to a legislative investigating committee; providing for the creation of a legislative investigating committee and the selection of the members thereof, and prescribing the powers, duties, authority and jurisdiction of said committee, and providing for the payment of all of the expenses and obligations incurred in connection with investigations conducted by said committee.

"WHEREAS, the unprecedented increase in the cost of state government has become a matter of grave concern to the people of the State of Kansas, and

"WHEREAS, the cost of state government is rapidly becoming an almost intolerable burden upon the people of our State, and

"WHEREAS, there is grave question that all functions of state government are being conducted in an economical and efficient manner, and

"WHEREAS, there is grave qustion as to whether or not many of our state agencies are being operated in an economical manner to the best interests of our people with a view to rendering the most service for the least possible expense, and

"WHEREAS, there has been no general investigation or study conducted for a great many years into the various activities of the numerous and sundry state departments and agencies with a view to determining whether or not they are being efficiently and economically operated, and

"WHEREAS, it is in the best interests of the people of the State of Kansas that our people and their Legislature have full and complete information in connection with the programs, activities, efficiency and administrative policies and practices of the various departments and agencies of our State so that such economies as are possible may be achieved and attained, and

"WHEREAS, deficiencies in state funds for financing Kansas government demand the utmost economies in state expenditures and efficiencies in state functions before the enactment of legislation providing for additional tax revenues.

*"Be it Resolved by the House of Representatives of the State of Kansas, the Senate of the State of Kansas Agreeing Thereto:*

"SECTION 1. There shall be a committee of seven (7) persons, three (3) of whom shall be members of the senate, and four (4) of whom shall be members of the house of representatives. Not more than two (2) of the members from the senate, nor more than three (3) of the members from the house shall be members of the same political party. The members of the committee from the house of representatives shall be selected by a majority vote of the members of the house. The members of the committee from the senate shall be selected by a majority vote of the members of the senate. Immediately after the selection of the members of the committee they shall meet and organize by electing from their own membership a chairman and vice-chairman. Said committee shall be and is hereby empowered and directed to make an immediate investigation in such manner as it may deem advisable of any official, officer, board, commission, agency or department of the state government, or the conduct in office of any officer or employee in any office, board, commission or department of the state government, or any other matter, including, but not by way of limitation, the number of state employees, the necessity therefor, the purchase, sale or use of all materials, supplies, facilities, and services by the state, its departments, agencies, boards, commissions or employees, and the expenditure of state funds resulting therefrom. In making such investigations, such committee shall have the powers conferred by the provisions of sections 46-108, 46-109 and 46-110 of the General Statutes of 1949 or any amendments thereto: *Provided,* That in case of disobedience on the part of any person to comply with any subpoena issued thereunder, or the refusal of any witness to testify to any matter regarding which he may be lawfully interrogated, it shall be the duty of the district court of the proper county, or the judge thereof, on application of the chairman of the committee to compel obedience by proceedings for contempt, as in the case of disobedience of the requirements of a subpoena issued from such court or a refusal to testify therein.

"SEC. 2. Said committee is hereby authorized to employ legal counsel or may request the attorney general to act as its legal counsel for the conduct of its proceedings and duties as it shall deem proper, except that the attorney general may be excluded in the event any inquiry or investigation is made concerning the conduct

of his office, and he may be refused access to the records of the committee relating to matters pertaining to his office. The services and facilities of the Kansas bureau of investigation shall be made available to the committee.

"SEC. 3. Said committee is hereby authorized to take and report

"EXHIBIT 'B-1'

HOUSE JOINT RESOLUTION No. 1—page 2

testimony and to employ for the recording of their proceedings and for preservation of such testimony and for the conduct of its proceedings and duties such necessary auditing, professional, stenographic, investigaton, and clerical help as it shall deem proper.

"SEC. 4. Said committee shall make such findings of fact and recommendations as it shall deem warranted by the evidence taken in any investigation. Each 60 days such committee shall send a progress report by mailing a copy thereof to each member of the 1956 legislature and shall submit its final report and such findings of fact and recommendations to the 1957 session of the legislature. Such committee shall have the authority to continue its investigation until the commencement of the 1957 session of the legislature.

"SEC. 5. Witnesses subpoenaed by the committee in any of its investigations, shall receive the same fees and mileage allowances that are allowed witnesses subpoenaed by the district courts of this state. Fees and mileage owing to witnesses subpoenaed by the committee, and any and all other expenses incurred by the committee shall be paid the same as other legislative expenses are paid from funds appropriated for legislative expenses. The department of administration is hereby authorized and directed to draw warrants upon the treasurer of state for the amounts and for the purposes as herein provided upon duly executed vouchers approved by the chairman or vice-chairman of the committee provided for in this resolution.

"SEC. 6. The members of said committee shall receive the sum of twelve ($12.00) per diem and their traveling and other expenses actually incurred in the performance of their official duties pursuant to this resolution.

"SEC. 7. There is hereby appropriated out of the state general revenue fund for the fiscal year ending June 30, 1957, the sum of seventy-five thousand dollars ($75,000), or so much thereof as may

be necessary, to the committee provided for in this resolution to pay the per diem and expenses of the members of the committee and all other expenses and obligations incurred in connection with the work of said committee: *Provided,* Notwithstanding any other provisions of this resolution, the amount made available by appropriation in this resolution shall be available for payment in the fiscal year of 1957 of obligations incurred during the fiscal year ending June 30, 1956 and the provisions of sections 75-3025 of the General Statutes of 1949 and section 75-3730 of the General Statutes Supplement of 1955 shall not apply to such obligations incurred during the fiscal year ending June 30, 1956.

"SEC. 8. This resolution shall take effect and be in force from and after its publication in the official state paper."