232 So.2d 1 (1970)
Lloyd C. HAGAMAN, Russell Stratton, Jr., Nancy Malloy (Mrs. W.P.), Individually, and As Employees of the Office of the Governor; and Wilbur Brewton and John C. Behringer, Individually, Appellants,
v.
William C. ANDREWS, Chairman, Elvin L. Martinez, Vice Chairman, Harold G. Featherstone, William G. James, Joe Lang Kershaw, Charles Nergard, Jerome Pratt, and Leonard V. Wood, As and Constituting the Elections Committee of the House of Representatives of Florida, and Capital City Second National Bank of Tallahassee, a Banking Association under the Laws of the United States, Appellees.
No. 39237.
Supreme Court of Florida.
February 12, 1970.
Rehearing Denied February 25, 1970.
*2 Gerald Mager, Julius F. Parker, Jr., of Parker, Foster & Madigan, Tallahassee, for appellants.
William G. O'Neill, of O'Neill & Trammell, Ocala, Joseph C. Jacobs and E.C. Deeno Kitchen, of Ervin, Pennington, Varn & Jacobs and Charles S. Ausley, of Ausley, Ausley, McMullen, McGehee & Carothers, Tallahassee, for appellees.
*3 ADKINS, Justice.
This is a direct appeal from a final judgment of the Circuit Court construing Sections 3(c) (1), 4(a) and 5, all contained in Art. III, Fla. Const. (1968), F.S.A.
This case arose when Capital City Second National Bank, herein referred to as "the Bank," filed its complaint seeking a declaratory judgment to determine the Bank's duty to respond to a subpoena duces tecum issued by the Committee on Elections of the House of Representatives of Florida requiring one of its officers to appear before the Committee and produce the Bank's records of deposits and disbursements of money by an organization known as "The Governor's Club." Five individuals, none of whom were connected with the Bank, but part of whom were admittedly connected with The Governor's Club were allowed to intervene.
The Bank is basically in the position of a stakeholder seeking a determination as to whether its legal duty to respect the privacy and confidence of its depositor must yield to the power of the Committee to subpoena its records. The real controversy is between those interested in The Governor's Club on the one hand (hereinafter referred to as the "Appellants") and the Committee on Elections (hereinafter referred to as the "Committee") on the other.
The trial judge ordered, inter alia, that the Bank respond to the subpoena duces tecum issued by the Committee and that the Appellants abide by the subpoena. The trial judge also held that the members of The Governor's Club or others having knowledge relating to The Governor's Club may be required to divulge their knowledge as to membership of The Governor's Club.
The Appellants first contend that Sec. 3(c) (1), Art. III, Fla. Const. (1968) does not authorize the conduct and initiation of investigation while the Legislature is in special session and in the absence of a requisite consent by each House.
Sec. 3(c) (1), Art. III, Fla. Const. (1968) reads as follows:
"The governor, by proclamation stating the purpose, may convene the legislature in special session during which only such legislative business may be transacted as is within the purview of the proclamation, or of a communication from the governor, or is introduced by consent of two-thirds of the membership of each house."
On November 7, 1969, the Governor issued an Executive Proclamation calling the Legislature into special session for ten days and limiting such call as follows:
"* * * for the sole and exclusive purpose of adopting legislation to implement and properly fund the sixteen-year road building program for the State of Florida and to select 1970 election primary dates."
On December 1, 1969, the Legislature convened in special session at which time the House of Representatives adopted House Resolution 18-A which provides as follows:
"* * *
1. It shall be the duty of the committee to make as complete an investigation as time permits of the course of conduct relating to the election process on the part of any person or group of persons which would constitute a violation of the Florida Statutes or which would interfere with the orderly processes of elections or which would hold up to disrepute the elective process.
2. Such investigations shall be conducted with the purpose of reporting to the house of representatives and to the legislature any activities of any person or group of persons which would indicate that corrective legislation requiring disclosure of the solicitation, collection, or disbursement of funds by or in behalf of candidates or public officials from private sources, fund raising, or contributors is desirable or necessary."
*4 This resolution was adopted by two-thirds vote of the House only and was never submitted to the Senate for its concurrence. Appellants contend that the resolution and the conduct of the investigation pursuant thereto by the Committee is null and void as not being in compliance with Sec. 3(c) (1), Art. III, Fla. Const. (1968).
This contention is without merit. Although Sec. 1, Art. III, Fla. Const. (1968) places the legislative power in a single entity, the Legislature of the State of Florida consisting of a Senate and a House of Representatives, Sections 2 and 5, of this Article grant to each House, acting independently of the other, numerous powers such as judging the qualifications and elections of its members, electing officers, determining its rules of procedure, disciplining its own members and conducting investigations.
Immediately following each general election the Legislature is required to convene for the exclusive purpose of organization and selection of officers. Sec. 3(a), Art. III, Fla. Const. (1968). At the organization session held on November 12, 1968, the House of Representatives adopted the report of the Rules Committee requiring the Speaker to appoint the membership of standing committees, including the Committee on Elections, beginning with the organization session. Journal of the House of Representatives (organization session 1968) page 10. The Elections Committee was appointed at that time. Journal of the House of Representatives (organization session 1968) page 25.
Sec. 7, Ch. 69-52 (Sec. 11.141, Fla. Stat., F.S.A.) contains the following provisions:
"(2) The house of representatives is authorized to designate standing committees in such number as it may determine to be necessary, which shall include a committee on rules and calendar and a committee on house administration.
"(3) When created and designated by rule of the respective house, such standing committees shall exist until the next ensuing general election, both during and between sessions, and shall be empowered to exercise all lawful functions and authority heretofore exercised by both standing and interim committees, including, but without limitation to, those provided by Section 5, Article III, State Constitution and by this chapter."
By this general law the Standing Election Committee continues to exist until the general election of 1970, "both during and between sessions." The calling of the special session did not diminish the powers or duties of the Committee. Just as the Senate's concurrence would be unnecessary in filling a vacancy in the office of Sergeantat-Arms in the House of Representatives, and just as the concurrence of the House would be unnecessary when the Senate declines to confirm an appointment, so it is that the concurrence of the Senate is unnecessary in the adoption of a resolution of the House of Representatives directing the Elections Committee to make an investigation. Either the House of Representatives or the Senate, acting independently of the other during a special session, can perform many autonomous functions, one of which is conducting necessary investigations, since these are incidents to the proper functioning of a legislative body.
The adoption of Resolution 18-A cannot be regarded as "legislative business" within the meaning of Sec. 3(c) (1), Art. III, Fla. Const. (1968), since the instructions of the House of Representatives to its Standing Committee on Elections does not require the concurrence or cooperation of the Senate. See In Re Advisory Opinion to the Governor, 64 Fla. 16, 59 So. 782.
The Appellants cite State v. Schoonover, 146 W. Va. 1036, 124 S.E.2d 340 (1962) and State ex rel. Fatzer v. Anderson, 180 Kan. 120, 299 P.2d 1078, 1079 (1956) in support of their contention that the Legislature had no power to adopt Resolution 18-A during the special session. In each of these cases *5 it appears that the resolution creating the investigating committee was adopted at a special session, while in the case sub judice the Committee was created at the organization session in November 1968, as authorized by Sec. 3(a), Art. III, Fla. Const. (1968). Furthermore, the Florida Committee is authorized to perform its functions under the provision of a general law, Chapter 69-52, which was concurred in by both the House of Representatives and the Senate, and became effective July 1, 1969.
Appellants further contend that the Committee is without authority to carry on its investigation subsequent to the adjournment of the Legislature. Chapter 69-52 is completely dispositive of this question by virtue of the following provisions:
"Each standing and select committee shall meet at such times as it shall determine and shall abide by the general rules and regulations adopted by its respective house to govern the conduct of meetings by such committees." Sec. 8, Ch. 69-52, (Fla. Stat. § 11.142, F.S.A.)
"Each standing or select committee or subcommittee thereof, is authorized to invite public officials and employees and private individuals to appear before the committee for the purpose of submitting information to it. Each such committee shall be authorized to maintain a continuous review of the work of the state agencies concerned with its subject area and the performance of the functions of government within each such subject area, and for this purpose to request reports from time to time, in such form as the committee shall designate, concerning the operation of any state agency and presenting any proposal or recommendation such agency may have with regard to existing laws or proposed legislation in its subject area." Sec. 9(1), Ch. 69-52 (Fla. Stat. § 11.143, F.S.A.)
"In order to carry out its duties each such committee, whenever required, may issue subpoena and other necessary process to compel the attendance of witnesses before such committee, and the chairman thereof shall issue said process on behalf of the committee. The chairman or any other member of such committee may administer all oaths and affirmations in the manner prescribed by law to witnesses who shall appear before such committee for the purpose of testifying in any matter about which such committee may desire evidence." Sec. 9(3) (a), Ch. 69-52 (Fla. Stat. § 11.143, F.S.A.)
"Each such committee, whenever required, may also compel by subpoena duces tecum the production of any books, letters, or other documentary evidence it may desire to examine in reference to any matter before it." Sec. 9(3) (b), Ch. 69-52 (Fla. Stat. § 11.143, F.S.A.)
"Should any witness fail to respond to the lawful subpoena of any such committee at a time when the legislature is not in session or, having responded, fail to answer all lawful inquiries or to turn over evidence that has been subpoenaed, such committee may file a complaint before any circuit court of the state setting up such failure on the part of the witness. On the filing of such complaint, the court shall take jurisdiction of the witness and the subject matter of said complaint and shall direct the witness to respond to all lawful questions and to produce all documentary evidence in his possession which is lawfully demanded. The failure of any witness to comply with such order of the court shall constitute a direct and criminal contempt of court, and the court shall punish said witness accordingly." Sec. 9(4) (b), Ch. 69-52 (Fla. Stat. § 11.143, F.S.A.)
When Resolution 18-A was adopted by the House of Representatives it merely set forth the scope of the inquiry to be made by the Committee, since the authority for the inquiry had previously been established by Chapter 69-52. This general law is in conformity with the provisions of Sec. 5, *6 Art. III, Fla. Const. (1968), which reads as follows:
"Each house, when in session, may compel attendance of witnesses and production of documents and other evidence upon any matter under investigation before it or any of its committees, and may punish by fine not exceeding one thousand dollars or imprisonment not exceeding ninety days, or both, any person not a member who has been guilty of disorderly or contemptuous conduct in its presence or has refused to obey its lawful summons or to answer lawful questions. Such powers, except the power to punish, may be conferred by law upon committees when the legislature is not in session. Punishment of contempt of an interim legislative committee shall be by judicial proceedings as prescribed by law." (Emphasis supplied)
Appellants contend that the procedural requirements of this constitutional provision were violated by the mechanical process of the issuance of the subpoenas, in that only the Speaker of the House, and not the Committee chairman, can issue a subpoena if the Legislature is in session. This contention is also without merit. The process by which the Committee procures the attendance of witnesses is a matter of procedure. Sec. 4(a), Art. III, Fla. Const. (1968) requires that "each House shall determine its rules of procedure." Pursuant to this command the House of Representatives enacted Rule 6.14, which provides in part:
"Rule 6.14 Witnesses  Notwithstanding any of the rules as otherwise set forth herein, the following shall be deemed supplemental and cumulative to all of said rules: * * *
"(c) In order to carry out its duties each standing or select committee, whenever required, may issue subpoena and other necessary process to compel the attendance of witnesses before such committee, and the chairman thereof shall issue said process on behalf of the committee * * *."
Sec. 5, Art. III, Fla. Const. (1968), quoted above, does not require the Speaker to issue subpoenas and Rule 6.14 does not conflict with its provision.
Appellants further contend that the Committee cannot undertake an investigation of the affairs of private individuals and of private organizations without doing violence to the constitutional guarantees contained in Sec. 12, Declaration of Rights, Fla. Const. (1968) and the First and Fourteenth Amendments of the Constitution of the United States. It is further contended that the lower court erred in holding these constitutional provisions inapplicable for the reason that The Governor's Club was not a private organization.
In Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273, Text 1284 (1957), the United States Supreme Court made several observations concerning legislative inquiry, one of which reads as follows:
"We start with several basic premises on which there is general agreement. The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste." (Emphasis supplied)
From the evidence the trial judge made the following findings concerning the nature of The Governor's Club:
"The case before the court might present difficulties were it not for the frank statement made by the Governor to the committee and the testimony identifying *7 the form letter used in procuring membership in The Governor's Club.
"The statement of the Governor, a copy of which was filed before the court very clearly indicates that revenues of The Governor's Club were and are disbursed under the immediate supervision of the Governor or those in his office and directly under his authority. These funds are disbursed in three general areas:
"(1) In the payment of expenses of the Governor in the performance of his duty to take care that the laws be faithfully executed but with reference to which legislative appropriations were not made or were inadequate.
"(2) In the payment of what might be termed quasi-official expenses of the Governor such as attending governors' conferences and out of state entertainment of prospective large investors in Florida when state appropriations were not made or were inadequate.
"(3) Payment of purely political expenses of the Governor's non-official but political activities.
"A form letter used to solicit membership in The Governor's Club indicated quite clearly that those who became members would have the privilege of `* * * regular meetings with the Governor and a direct telephone line to him.' (Note: This contact is the Governor  the chief executive of the State  as is distinguished from the individual who occupies that office.)
"The form of application indicates that each membership costs exactly $500.00 but the form also shows that one individual or company can purchase any number of memberships.
"There has been no effort to establish before the court that there has been any membership in The Governor's Club purchased from any improper motive or that any of the funds of The Governor's Club have been spent for any unworthy purpose."
The Circuit Judge correctly held that The Governor's Club has functioned in such a manner so closely related to the office of the Governor that it is not such a private organization as to place it beyond the scope of proper legislative investigation as to sources of revenue and its expenditures of that revenue. It is not unusual for a private club to take on attributes of government. See Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), an election case, holding that a private club created for public purpose of designating candidates in a preliminary election as nominees to appear on the ballot in the Democratic primary was a state agency, hence persons could not be denied participation because of race.
The interest of the Appellants in their associational privacy having been asserted, we have for decision the question of whether the public interest overbalances conflicting private ones. Whether there was justification for the investigation turns on the substantiality of Florida's interest in obtaining the identity of the members of The Governor's Club when weighed against the individual interest which the Appellants assert. See Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959), where the Court held that the State's interest in protecting itself against subversion outweighed the associational privacies of persons whose names appeared on a list of camp guests.
We cannot simply assume, however, that every legislative investigation is justified by a public need that overbalances any private rights affected. To do so would be to abrogate the responsibility placed by the Constitution upon the Judiciary to insure that the Legislature does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty, his speech, or assembly, nor engage upon unwarranted *8 witch hunts. The solution is not to be found in testing the motives of the Committee members, as their motives alone would not vitiate an investigation which had been instituted by the House of Representatives if the legislative purpose is being served. The theory of a Committee inquiry is that the Committee members are serving as the representatives of the Legislature in collecting information for a legislative purpose and are acting as the eyes and ears of the Legislature in obtaining facts upon which the full Legislature can act. Watkins v. United States, supra.
The Committee is attempting to investigate The Governor's Club in order to deter mine the donors, the amount of contributions, and the amount and purpose of expenditures. This purpose is clearly stated in House Resolution 18-A quoted above.
Receipts and disbursements of candidates for public office have always been regarded as an appropriate subject for statutory regulation and public disclosure. Fla. Stat. §§ 99.161, 99.172, and 99.183, F.S.A. relate to these matters. Similar laws applicable to the financing of political activities of persons in office who are eligible for re-election are also a proper matter for legislative consideration. The elective process does not end on election day nor does the legitimate interest of the Legislature in contributions cease when the candidate is elected.
Many classes of persons are prohibited from making contributions to candidates for public office. Certainly, there is justification in determining the interest represented by an individual contributor to an organization, such as The Governor's Club, so the Legislature will be able to determine the necessity of enacting additional laws. Also, the Legislature in its wisdom could place other classes of persons within categories prohibited by statute from making contributions. Also, the limitation on maximum contributions for candidates for public office is a proper subject of investigation. Furthermore, the purpose of the contributions and what a contributor is receiving for his contribution are proper matters of investigation.
The case of Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), relied upon by Appellants, is not in conflict with the result we reach. The United States Supreme Court in its opinion said:
"* * * we rest our result on the fact that the record in this case is insufficient to show a substantial connection between the Miami branch of the N.A.A.C.P. and Communist activities which the respondent Committee itself concedes is an essential prerequisite to demonstrating the immediate, substantial, and subordinating state interest necessary to sustain its right of inquiry into the membership lists of the association."
The record in the case sub judice is sufficient to show a substantial connection between The Governor's Club and the activities of the Government of the State of Florida. The record amply demonstrates the substantial State interest necessary to sustain the right of the committee to inquire into the membership list of the association.
The lower court was correct in ordering the Bank to comply with the subpoena and subpoena duces tecum of the Committee. Unquestionably, the Committee has the power and the authority to issue a subpoena duces tecum for the production before it of any books, papers, documents and records germane to the subject of its investigation. There is no evidence before the Court on which we can ground a determination that the subpoena duces tecum was too broad or that the papers and documents were not pertinent to the subject of inquiry. See A S P, Inc. v. Capital Bank & Trust Company, 174 So.2d 809 (La. App. 1965). The case of Milohnich v. First National Bank of Miami Springs, 224 So.2d 759 (Fla.App.3d 1969), relied upon by Appellants, does not attempt to *9 deal with disclosure required by the government or under compulsion of law.
In summary, the Court is aware of the financial sacrifices made by many citizens when they assume public office and the problems involved in securing sufficient public funds to meet the budgets of many public offices. Perhaps the use of private donations may be a solution, but surely the Legislature has the right to be just as inquisitive concerning the use of private funds in the operation of the office as in the campaign for election to the office.
An elective official owes to his constituents not only his time and his devoted service, but also his intelligence and his conscience. A public officer after election who seeks pledges from eager or interested electors may well be no longer a representative of the electors, but a messenger boy. In fact, the bare possibility of the existence of such a situation could shatter public confidence in government and "hold up to disrepute the electorate process." This is a proper subject of investigation as authorized by Resolution 18-A.
Also, the giving of funds by individuals of wealth and by private associations to enforce some particular law or group of laws, which they single out from the great body of the statutes, is shocking to the law-abiding, public-spirited citizen. This is a subject of overriding and compelling state interest which may require legislative prohibition or regulation after an appropriate investigation as to those who contribute, the amount of their contributions, and the ultimate use of the funds.
The sum and substance of the whole matter is the right of the citizen to know about The Governor's Club, or similar organizations, for this right instills confidence in government, just as the right to speak and be heard improves government.
The Judgment of the Lower Court is affirmed.
CARLTON and BOYD, JJ., and RAWLS, District Court Judge, concur.
FALK, Circuit Judge, concurs specially with opinion.
OWEN, District Court Judge, dissents with opinion.
DREW, J., dissents with opinion.
FALK, Circuit Judge (Concurring specially).
I concur in the majority opinion, but would like to point out that moderation and caution should be the rule when the Committee on Elections exercises its power of inquiry involving the Chief Executive of the State of Florida, the head of a coequal branch of government. If not surrounded by reasonable limitations, the power of inquiry can lead to abuses and encroachment on individual liberties. It should not be exercised merely for the sake of disclosure, to the detriment of the citizen under interrogation. Legitimate legislative action is the ultimate objective and the prime justification for the inquiry. Gibson v. Florida Legislative Investigation Committee, Fla., 108 So.2d 729.
I further am of the opinion that the records subpoenaed should not have to be publicly exposed or delivered to the Committee or to anyone else or to be filed, but that the official custodian or witness familiar with its contents can be required to refer to them to authenticate his or her testimony. This was the procedure approved by this Court in Gibson v. Florida Legislative Investigation Committee supra; so that those who are legitimate and good faith members of the Governor's Club are adequately protected against any embarrassment which might follow upon the unjustifiable publication of the entire list of members.
*10 OWEN, District Court Judge (dissenting).
I concur that the defendant Committee on Elections of the House of Representatives was legally authorized to conduct investigations subsequent to the adjournment of the legislature and that its authority to issue subpoenas was validly exercised. The basis of my dissent, upon which I would reverse the judgment of the trial court and quash the subpoenas in question, is the clear lack of a nexus between the information sought and a subject of overriding and compelling state interest.
At the outset it should be made clear that in my opinion that portion of House Resolution 18-A which made it the duty of the committee to investigate conduct which would constitute a violation of the Florida Statutes clearly exceeded constitutional bounds. Section 3, Art. II, Fla. Const. (1968) prohibits members of the legislative branch from exercising any powers appertaining to the executive or judicial branches of the government, unless expressly provided in the constitution. It has long been a settled principle of constitutional law that an investigation of an alleged violation of existing law is a function which is exclusively vested in the judicial branch of government. Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1880); 16 C.J.S. Constitutional Law § 122. We are, of course, not here concerned with a legislative committee appointed pursuant to Sec. 17, Art. III, Fla. Const. (1968) to investigate charges against the Governor.
House Resolution 18-A expressly provided that the purpose of the committee conducting such investigations [as were constitutionally authorized] was so that the committee could report to the House of Representatives any activities which would indicate that corrective legislation requiring disclosure of the solicitation, collection, or disbursement of funds by or in behalf of candidates or public officials from private sources, fund raising, or contributors is desirable or necessary. The information which the committee was seeking through use of the subpoenas under attack here was within the area of constitutionally protected rights of speech and of association. It is an essential prerequisite to the validity of an investigation which intrudes into the area of such constitutionally protected rights that the state convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Thus, the question squarely presented is whether the state has convincingly shown such a substantial relationship between the information sought and the purpose of its inquiry.
I think that question must be answered in the negative. The committee was already aware of the activities of The Governor's Club, including the method and means of the solicitation, collection and disbursement of its funds. The statement of the Governor which was before the trial court clearly indicated that revenues of The Governor's Club were disbursed under the immediate supervision of the Governor or those in his office and directly under his authority, in three general areas. The committee could easily infer that at least some of those who elected to become members did so for other than altruistic purposes since the invitation to membership suggested that members would have access to the Governor's ear. With this information available, what cogent benefit would the committee derive from having the names and addresses of the members, the amounts paid for membership, and the exact dates, amounts and purposes of expenditures from The Governor's Club funds which would justify the substantial abridgement of constitutional freedoms which such disclosure would effect? I certainly can see none which was presented to the trial court nor argued in the briefs before this court.
Appellees insist that a disclosure of such information could well show violation of existing law. Possibly this is what the appellee *11 expects to accomplish, either by establishing that membership had been purchased by persons or corporations who were prohibited by law from making political contributions, or by establishing that the funds when received became state funds and should have been deposited in the state treasury. See Advisory Opinion to the Governor, Fla. 1967, 200 So.2d 534. Whatever the motive behind the committee's zeal to search out possible violations of law on the part of the Governor, it is clear that the committee did not have constitutional authority to engage in that type of investigation under House Resolution 18-A. Once we eliminate from the committee's scope any search for possible violation of existing law, we can focus upon the limited area within which such inquiry would have a legitimate purpose, to-wit: the determination of whether corrective legislation requiring disclosure is desirable or necessary. The majority opinion, in touching on this area, suggests that the information sought to be obtained through the subpoenas would enable the legislature to make a determination of the necessity of legislation which would place other classes of persons within the categories prohibited by statute from making political contributions, or legislation which would change the limitation on maximum contributions, or legislation which could prohibit contributors from receiving any type of benefit from the state. While I agree that these are proper subjects of legislative inquiry, I cannot agree that the disclosure of the constitutionally protected information is essential (or even helpful) to the legislature in reaching a determination of the necessity of corrective legislation on any of these subjects.
We must assume that the goal of any corrective legislation recommended by the committee on elections is to improve the election process, eliminating from it any matters which could foreseeably interfere with the orderly processes of election or which would hold up to disrepute the elective process. Assuming that such an organization as The Governor's Club does not violate existing law, would the election process be improved by prohibiting such organizations in the future? If an organization of this type is objectionable as a detriment to orderly elective processes, it is because of its existence per se, and not because of those who might at any given time constitute its membership. Patently, the identify of its membership should not be a factor in the philosophical determination of whether such an organization should be prohibited. Likewise, should the legislature deem it an improvement on the election process to permit such organizations to exist provided they be made subject to regulations concerning public disclosure of membership and finances (as well as any other restrictions or limitations) such a determination must of necessity be based upon a purely philosophical view that such regulations and restrictions are in the best interest of the public. Could it possibly be successfully contended that the legislature's determination of the desirability of regulating such organizations in the future would hinge upon or even be remotely affected by a subjective scrutiny and evaluation of the present membership of The Governor's Club? The membership could and probably would change from time to time. Would one set of members "pass inspection" resulting in a decision that regulation was not desirable, while another set of members might be determined to be persona non grata resulting in a legislative determination at that time that because of the particular identity of the membership, regulation of such organizations had become desirable? The answer must surely be apparent on the face of the question. If the present existence of The Governor's Club and its method of operation creates a potential for political activities which the legislature feels should be either prohibited or restricted, such potential exists irrespective of the present membership, and that potential is neither increased nor decreased by the committee obtaining the information which it seeks through the subpoenas in question.
*12 I make no effort to condone either the existence of The Governor's Club or the manner in which the same is operated. But the right of its members to constitutional guarantees of associational freedom must not be abridged under the guise of legislative investigation. In my opinion this case is squarely controlled by the principles enunciated in the Gibson case, supra, and I would reverse that portion of the order requiring the appellants to comply with the subpoenas issued by the committee.
DREW, Justice (dissenting).
I am in complete accord with the views expressed and the conclusions reached in Judge Owens' dissent. It is particularly noteworthy that during the December 1969 Special Session of the Legislature, the Florida Senate dealt with the problem involved here by the simple expedient of unanimously enacting Senate Bill 30-A[1] on December 8, 1969. This bill was received in the House on December 9th, placed temporarily in the Committee on Rules and Calendar, but died there on adjournment of the Special Session. It is also of interest to note that during the same special session Senator Thomas introduced Senate Bill 11-A[2] relating to the same subject. The Senate Journal of December 3, 1969, reflects that such bill was stricken from the Journal because it was *13 not within the purview of the Governor's call and did not, on introduction, receive 2/3 consent of the Senate membership. As I read the record here, Senate Bill 30-A would, if enacted into law, accomplish that which appears to be the concern of the House. The Senate obviously did not feel the necessity of an investigation in order to reach the conclusion that such legislation was in the public interest.
Moreover, the principle of separation of powers is basic in our form of government. It is recognized in our new Constitution in these words:
"Branches of Government.  The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Fla. Const.art. II, § 3 (1968).
Great restraint should be observed by each of the three branches of government toward the other if the purposes of our forefathers is to be served. The tendency to abandon these basic  I think almost sacred  principles has produced infinitely more problems than it has solved. Current events emphasize the wisdom of George Washington in his farewell address more than 150 years ago when he said:
"The spirit of encroachment tends to consolidate the powers of all the departments into one and this creates a real despotism. A just estimate of that love of power, and proneness to abuse it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power has been evinced by experiments ancient and modern, some of them in our own country and under our own eyes. Let there be no change by usurpation. It is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance  in permanent evil  any partial or transient benefit which the use can at any time yield."
Judge Owen points out that this investigation is not being undertaken pursuant to the power to impeach especially vested in the House by the Constitution. Where this power is invoked the investigation may be as broad and expansive as necessary to determine whether the Governor is guilty of "misdemeanor in office." But, where the Governor  the Chief Executive  is the subject of such charges, it should be unmistakably clear that the investigation is for that purpose. This great authority of the Legislative Branch over the Executive and Judicial should be, and has always been, exercised with great restraint. In this area of possible conflict between coordinate branches of government, great power should be exercised with equally great caution and restraint.
For these, as well as the reasons stated by Judge Owen, I dissent from the majority.
NOTES
[1] "A bill to be entitled AN ACT relatlating to public officers; requiring the filing of annual statements of any contributions received and expenditures made from such contributions; providing penalties; providing an effective date.

"Be It Enacted by the Legislature of the State of Florida:
"Section 1. When used in this act `public officer' means a person holding an elective national, state, county, or municipal office.
"Section 2. Each public officer shall file an annual statement containing a list of all contributions received and expenditures made from such contributions by such officer or on his behalf by any political club, or other fund, from which he derives personal or political benefit with the names and addresses of such person or persons making such contributions or receiving payment from such expenditures and the dates thereof. Contributions shall include but not be limited to donations in excess of ten dollars ($10) made to fund-raising dinners and other affairs. The statement shall be sworn to by the public officer as being a true, accurate, and total listing of all of said contributions and expenditures.
"Section 3. The statement shall be filed prior to May 15 of each year with the department of state for a state or national office, the clerk of the circuit court for a county office, and the city clerk of the municipality for a municipal office.
"Section 4. If any public officer fails to comply with this act, he shall be deemed guilty of a misdemeanor in office and shall be punished by fine not exceeding two thousand five hundred dollars ($2,500) or by imprisonment in the county jail not exceeding twelve (12) months, and shall be deemed guilty of neglect of duty in office, and shall be subject to removal from office or to impeachment or to expulsion from the senate or house of representatives, as the case may be.
"Section 5. This act shall take effect January 1, 1970."
[2] "A bill to be entitled AN ACT relating to state officers and employees; prohibiting the solicitation of funds by any state officer or employee from any person who has or seeks business relations with the department of transportation; providing an exception for charitable purposes; providing penalties; providing an effective date.

"Be It Enacted by the Legislature of the State of Florida:
"Section 1. (1) No state officer or employee shall directly or indirectly solicit funds from any person who has, maintains, or seeks business relations with the department of transportation.
"(2) The provisions of this section shall not be construed to include within its terms the solicitation of funds for charitable purposes including but not limited to such organizations as the United Fund, Heart Fund or American Red Cross.
"(3) Violation of the terms of this section shall be a misdemeanor, and shall subject the officer or employee violating its provisions to removal from his office or employment.
"Section 2. This act shall take effect upon becoming a law."