**THE STATE OF FLORIDA** upon the relation of **E. FREEL SINGLE-TON**, v. **C. J. WOODRUFF**, Chief of Police of the City of Tampa, Hillsborough County, Florida.

13 So. (2nd) 704         January Term, 1934
June 1, 1943         En Banc

*Bryan & Bryan,* for petitioner.

*Alonzo B. McMullen* and *Ralph A. Marsicano,* for respondent.

TERRELL, J.:

Petitioner, a member of the religious sect known as Jehovah's Witnesses was engaged in distributing literature on the streets of Tampa, published by the Watchtower Bible and Tract Society, a foreign corporation. The said literature was devoted to the religious faith of the petitioner who was arrested on a charge of violating an ordinance of the city as follows:

"That a license tax of fifty ($50.00) Dollars per annum be and the same is hereby levied upon and shall be collected from every person whether principal, agent or employee exercising the privilege or engaging in the business or occupation of peddling, vending, canvassing, selling or offering for sale in the streets or other public places or from house to house within the limits of the City of Tampa any books, magazines, periodicals or pamphlets."

He was placed on trial but prior to conviction applied to this Court for writ of habeas corpus. The writ was granted, a return thereto was filed which petitioner moved to quash on the ground that he was engaged solely in the business of selling or offering for sale and accepting contributions for and circulating religious and Bible literature relating to his faith. There is no dispute on this point so the question presented is whether or not the quoted ordinance is applicable to the sale and distribution of literature relating to one's religious belief.

A wealth of decisions have lately treated this point and a few have approved the requirement of a modest license charge as a prerequisite to such sale or distribution. Rosco Jones v. City of Opelika, 316 U.S. 584, 62 Sup. Ct. 1231, 86 L. Ed. 1691, being typical but the decided weight of authority is to the contrary. Lovell v. City of Griffin, 303 U.S. 444, 58 Sup. Ct. 666, 82 L. Ed. 949; Cantwell v. Connecticut, 310 U.S. 296, 60 Sup. Ct. 900, 84 L. Ed. 1213; Schneider v. State of New Jersey, 308 U.S. 147, 60 Sup. Ct. 146, 84 L. Ed. 155; Jamison v. Texas, decided March 8, 1943; State ex rel. Wilson v. Russell, 146 Fla. 539, 1 So. (2nd) 569; State ex rel Hough v. Woodruff, 147 Fla. 299, 2 So. (2nd) 577; City of Blue Island v. Kozul, et al., 379 Ill. 511, 41 N.E. (2nd) 515; State v. Meredith, 197 S.C. 351, 15 S.E. (2nd) 678; Cincinnati v. Mosier, 61 Ohio App. 81, 22 N.E. (2nd) 418. We approve the rule in these cases.

The latter cases are predicated on the theory that freedom of religion and the press as guaranteed by the First and Fourteenth Amendment to the Federal Constitution and Sections 5 and 13, Declaration of Rights, Constitution of Florida, are absolute so long as public morals, public health, public safety and convenience are observed and there is no charge here that

any of these are being infringed as was the case in Reynolds v. U.S., 98 U.S. 145, 25 L. Ed. 244; Davis v. Beason, 133 U.S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637; and Knowles v. U.S., 170 Fed. 409.

Every system of law rests on a corresponding system of ethics that directs its course. The last cited cases point this precept. We are committed to a free exercise of religious opinion but since our system of law rests on Christian ethics one would not be permitted to set up a harem and practice polygamy in Florida under the guise of religious freedom because polygamy is contrary to approved moral standards. If our law were predicated on Mohammedan ethics, the converse would be true. If it were predicated on pagan ethics, I could sell my child as a slave and if predicated on still another system and I belonged to the sect known as Dukhoboras, I would be permitted to traverse the highways nude under the guise of religion but not so in our country because our system of moral teaching raises a different standard that the law must conform to.

The reason the Bill of Rights immunized religion and the press from governmental interference is not far to seek. Sections 5 and 13, Declaration of Rights, Constitution of Florida, merely reinforced the Federal immunization of these liberties. The authors of the Bill of Rights descended from ancestors who had been persecuted and condemned to rot in jail for indulging religious and secular beliefs. It took them a thousand years to wrest these liberties from arbitrary kings, hence the inhibition against any attempt to shackle the conscience. A liberated conscience is as essential to a robust democracy as blood is to the human body. Enslave the conscience and democracy will perish as certainly as the body will perish when the blood ceases to circulate. The church, the press, and the assembly were set apart by the Bill of Rights to educate the mass conscience and give wings to public opinion. But the church and the press were not liberated from governmental interference carte blanche; to their liberty was attached an obligation to the public on parity with the freedom given.

Freedom of conscience is much older than the Declara-

tion of Rights or the common law. Peter and John first invoked it when they were commanded by the high priest and the Roman rulers to speak and teach no more in the name of God. Acts 4:17-21. So the soil from which it springs like many other cherished precepts of the common law reach back to Hebrew origin and historically reveal why a free press, speech, and religion are in a preferred class, protected by the State and Federal Constitutions and immunized from charge by the State.

After this opinion was written but before it was promulgated by the Court, the Supreme Court of the United States decided Robert Murdock, Jr., v. Commonwealth of Pennsylvania, City of Jeannette and Thelma Martin v. City of Struthers, both opinions filed May 3, 1943, wherein the same question was reviewed and a like conclusion reached. Factual questions were raised in these cases that were not presented in this but the Court narrowed the issue by holding merely that "spreading one's religious beliefs or preaching the gospel through distribution of religious literature and through personal visitations is an age old type of evangelism with as high a claim to constitutional protection as the more orthodox types." We are bound by the holding in these cases and also the holding in Robert L. Douglas et al. v. City of Jeannette et al., decided the same date.

In the Murdock case just cited, the Court was confronted with an ordinance very similar to that in the instant case while in the Martin case, it was confronted with an ordinance making it unlawful for any person distributing hand bills or other advertisements to ring the doorbell, sound the door knocker, or otherwise summon the inmates to the door to receive them.

In the first case, the Court not only narrowed the issue in the manner stated but expressly left open to regulation by the police power the manner in which the practice is exercised. The holding in the second case was to like effect. In other words, one cannot be prohibited from strewing his religious wares up and down the street and from house to house; at the same time one would not be permitted to speak, practice, or distribute under the guise of religion that which en-

dangers public morals or public health nor would one be permitted· to speak, practice, or distribute his religious beliefs in places or at times that would endanger public safety and convenience. The municipality may still regulate the time, places, and the manner of using its streets or holding meetings thereon in the interest of public safety without invading the Declaration of Rights or the Fourteenth Amendment. This must be by general non discriminatory legislation unhampered by the arbitrary will of any one. Cox v. State of New Hampshire, 312 U.S. 569, 61 Sup. Ct. 762, 85 L. Ed. 1049; Chaplinsky v. New Hampshire, 315 U.S. 568, 62 Sup. Ct. 766, 86 L. Ed. 1031; Hannan v. City of Haverhill, 120 Fed. (2nd) 87.

It was said by Thomas Jefferson "that our liberty depends on the freedom of the press and that cannot be limited without· being lost." Our whole theory of democratic polity as well as law rests on like moral standards and the church is a medium by which they are refined. Social regeneration is not measured by gadgets, sport suits, a chicken in every pot, and two cars in every garage; neither is it inherited like blue eyes and a stomach that will dissolve nails. It is tested by spiritual. response, self discipline, a willingness to sacrifice, and a wholesome respect for the sanctity of the individual, his equality before the law, his abhorrence of privilege, and his right to a place in the sun without which democracy will go pagan and turn autocrat. Herein lies the obligation of the church and the press to point each generation the way to these virtues and failing in this, they fail in their debt to the Bill of Rights.

To confer a free exercise of religious profession charged with an obligation like this and then lay a heavy tax on the performance of the obligation when no question of morals, safety, and convenience is involved is contrary to the letter and spirit of the Declaration of Rights. The ordinance drawn in question cannot therefore be enforced against petitioner. The motion to quash is accordingly granted and the petitioner is discharged.

It is so ordered.

BUFORD, C. J., CHAPMAN, THOMAS and ADAMS, JJ., concur.

BROWN and SEBRING, JJ., concur specially.
BROWN and SEBRING, JJ., concurring specially:

Brown and Sebring, Justices, concur in the conclusion that the ordinance is unconstitutional as applied to the facts of this case, and also concur in the judgment discharging the petitioner from custody.