360 So.2d 83 (1978)
BYRON, HARLESS, SCHAFFER, REID AND ASSOCIATES, INC., a Florida Corporation, Appellant,
John DOE, Intervenor,
v.
STATE of Florida ex rel. Robert W. SCHELLENBERG and Robert L. SHEVIN, Attorney General of the State of Florida, Appellees.
No. DD-30.
District Court of Appeal of Florida, First District.
June 1, 1978.
*85 William H. Adams, III, Thomas M. Baumer, and Stephen D. Lobrano, Jacksonville, for appellant.
Delbridge L. Gibbs, Jacksonville, for intervenor Doe and as amicus curiae.
Robert L. Shevin, Atty. Gen., James D. Whisenand, Deputy Atty. Gen., William C. Sherrill, Jr., Sharyn L. Smith, Asst. Attys. Gen., Tallahassee, and Frederick R. Brock, of Wildt, Quesada, Brock & Skinner, Jacksonville, for appellees.
SMITH, Judge.
This case presents constitutional and other issues concerning Florida's public records law, Sections 119.01, et seq., Florida Statutes (1977). In March 1976, Jacksonville Electric Authority ("JEA"), a public agency, employed Byron, Harless, Schaffer, Reid & Associates, Inc. ("the consultant"), an independent firm of psychologists skilled in evaluating management, to search nationwide for potential applicants for the open position of JEA managing director. The consultant's Dr. Reid and other personnel, promising confidentiality, interviewed a number of prospects, made notes of their interviews and impressions, and received approximately 20 resumes and 40 letters. Most of the material was discarded as prospects withdrew from consideration, but a small stack of handwritten and typewritten material remained in the consultant's possession on March 24, 1976, when appellee Schellenberg, a Jacksonville television executive, *86 requested an opportunity to inspect the consultant's papers. The consultant refused. On the application of appellees Schellenberg and the Attorney General, the circuit court issued a writ of mandamus to compel production and public inspection of the consultant's papers as public records. Section 119.07. However, the court impounded and sealed the papers pending appeal because "significant damage may result" from disclosure. Section 119.11. The consultant appealed and we received briefs and oral argument on the nonconstitutional issues.
We then examined the consultant's papers and found that they identify several prospects and record their addresses, the positions they then held in utilities elsewhere in the country, biographical data, and comments by the prospects on their personalities, personal strengths and weaknesses, aspirations, work and living habits, and families. Recognizing the stake in this proceeding of persons not then before the court, and sensing their potential claim of a Constitution-based right of privacy in the information recorded in the papers,[1] we summarized the contents of the consultant's papers, omitting names and other identifying information, in an order entered and made public July 1, 1977. Copies of the consultant's papers concerning particular prospects were mailed to those whose addresses were known. We later opened the file to counsel of record, who have honored our order that no identifying information be revealed to others. We invited the identifiable prospects to intervene under pseudonyms. Intervenor Doe appeared through Delbridge L. Gibbs, Esquire, who accepted our appointment to appear for Doe and as amicus in the interest of other prospects who did not intervene. Additional briefs and reargument were received on the privacy claims of Doe and the amicus. We are indebted to lawyer Gibbs for his service and to all counsel for their first-rate briefs and arguments.
The Attorney General and appellee Schellenberg have presented reasoned arguments against Constitution-based privacy claims of the nature asserted here. Nevertheless, after examining the consultant's papers for the first time shortly before reargument, Assistant Attorney General Smith suggested in behalf of appellees, at the close of argument, that these particular papers ought never to have been prepared and now should be destroyed, returned, or otherwise withheld from public disclosure. We do not consider that that suggestion  voiced by one whose advocacy of free public access to the records of public business is firmly established  moots the case or deprives it of essential adversariness.[2] The suggestion, though obviously deliberated, was in the nature of a cri de coeur, for appellees neither acquiesced in the intervenor's constitutional claim nor suggested any other rationale for suppressing the papers except the possibility of prohibiting public agencies from collecting "psychological" data in employment interviews. That suggestion, for reasons stated below, we cannot accept. Appellees' written submissions after *87 the argument resumed the adversary position taken before. At any rate, appellees cannot be held to have waived any right other members of the public may have to inspect the consultant's papers as public records. All parties urge, and we agree, that the issues here require a decision. Ervin v. Capital Weekly Post, Inc., 97 So.2d 464, 466 (Fla. 1957).[3]
The issues are (a) whether in its research for potential applicants to JEA the consultant was "acting on behalf of" JEA and so was subject to Chapter 119; (b) whether these particular papers are "public records" notwithstanding their informality and their exclusive use to aid the consultant's oral discussion of prospects; and (c) whether intervenor Doe and the other subjects have a Constitution-based right that the papers, or some of their contents, not be disclosed publicly.

I. The consultant was "acting on behalf of" JEA

JEA agreed to pay the consultant $75 per hour up to $20,000 to conduct "an executive search" for one or more qualified candidates for the highly responsible and well-paid position of JEA managing director. Both the consultant and JEA were persuaded that the success of such a search depends on assuring those interviewed that the fact of the interview and the information given by the prospect would be held in confidence. JEA and the consultant therefore agreed that the consultant would search confidentially for prospective candidates; that the identities of those interviewed by the consultant, and the resulting information, would be kept confidential by the consultant until one or more of the best qualified prospects consented to become formal candidates; that the consultant would submit a final written report on the candidates, whose identity and biographical information would then become public; and that JEA would finally make its selection in full public view. Jacksonville's general counsel advised the consultant that any notes prepared by the consultant for the "exclusive use and eyes" of its own personnel would not be public records subject to disclosure under Section 119.07. JEA's purpose was to permit potential candidates, who typically were employed in positions of high responsibility elsewhere, to talk freely with the consultant without jeopardizing their present positions. The evidence shows that many prospects spoke to the consultant of "dire consequences" to their careers should their conversations with the consultant be made public. Some took elaborate measures, before talking, to assure themselves of the consultant's identity and reliability.
Conceptually, therefore, the consultant and JEA were to perform separate roles, the consultant searching for and identifying qualified potential candidates, and JEA publicly selecting from among the candidates. The arrangement thus sought to preserve a distinction in roles this court recognized in State ex rel. Tindel v. Sharp, 300 So.2d 750 (Fla. 1st DCA 1974), cert. denied, 310 So.2d 745 (Fla. 1975), holding that the written work product of an educational consultant, employed by a school board to assist in the search for a new superintendent, was the consultant's "private property" and was not subject to public scrutiny if not delivered to the school board. At the time of Tindel, the disclosure requirement of the public records act applied only to public agencies, defined as
... any state, county or municipal officer, department, division, board, bureau, commission or other separate unit of government created or established by law. [Section 119.011(2), Florida Statutes (1973).]
By Chapter 75-225, Section 3, Laws of Florida, Section 119.011(2) was amended to extend the definition of "agency" to include "any ... business entity acting on behalf of any public agency." On supplemental *88 briefs which we requested, we have explored the possibility that the 1975 act should be read narrowly to embrace the records of only those private contractors to whom the public agency has delegated a significant part of the agency's power of decision on the public question at hand. Were that the proper construction of Section 119.011(2), it would be necessary to consider whether the consultant and JEA preserved in practice the conceptual distinction between their respective roles of developing prospects and acting on candidates.[4] But the text of the 1975 amendment and its legislative history made clear that the legislature did not intend to recognize such a distinction. Rather, the legislative purpose was to extend the reach of Chapter 119 to those whom Tindel held were not reached by the law as it existed in 1974. A business entity such as the consultant must be regarded as "acting on behalf of" the public agency if the services contracted for are an integral part of the agency's chosen process for a decision on the question at hand. See Town of Palm Beach v. Gradison, 296 So.2d 473, 476-77 (Fla. 1974). Because the consultant was employed to perform and did perform a preliminary search and inquiry function which JEA thought necessary or desirable for its proper decision, the consultant was "acting on behalf of" JEA and was therefore an "agency" to which the public records law applied.

II. The consultant's notes are "records"

The consultant urges that its handwritten notes of interviews and impressions do not rise to the dignity of "records" to which the public record law applies. Section 119.011(1) defines "public records" as:
... all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency.
The staggering ramifications of this definition are nowhere more evident than in Section 119.041, which forbids the mutilation, destruction or other disposition of any public record "without the consent of the division of archives, history and records management of the department of state."
It is certainly true that the encompassing definition made by Section 119.011(1) and the proscription of Section 119.041, if scrupulously observed, will require more government warehouses than wastebaskets. The consultant's brief aptly suggests:
A literal reading of the word "regardless of physical form or characteristics" would result in including within the definition every scrap of paper marked on by a public official while at work, including notes to himself designed to aid in his thought processes, preliminary notes made before drafting letters, drafts of documents that are never used, mistakes of various kinds that are later corrected, and doodling. These papers are nothing more than graphic representations of the preliminary thought processes of particular individuals. Some people must make notes to think clearly. Some need notes to jog their memories. Others have to draft letters several times before they say what the writer wants to communicate. Papers of this sort are clearly personal in nature. For those who perform the same work but are able to draft without notes, no such documents ever exist.
Section 119.011(1) provides a definition of "public records" vastly more expansive than the previous judicial definition. See Amos v. Gunn, 84 Fla. 285, 343, 94 So. 615, 634 (1922):
A public record is one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or *89 directed by law to serve as a memorial and evidence of something written, said, or done.
Section 119.09 authorizes the Division of Archives, History and Records Management to establish, in consultation with agencies, "a time period for the retention or disposal of ... records." Section 267.021(2) defines "records," for purposes of the Florida Archives and History Act, identically to Section 119.011(1). The Archives and History Act provides in Section 267.051:
(8) No record shall be destroyed or disposed of by any agency unless approval of the [Division of Archives, History and Records Management of the Department of State] is first obtained. The division shall adopt reasonable rules and regulations not inconsistent with this chapter which shall be binding on all agencies relating to the destruction and disposal of records. Such rules and regulations shall provide but not be limited to:
a. Procedures for compiling and submitting to the division lists and schedules of records proposed for disposal.
b. Procedures for the physical destruction or other disposal of records.
c. Standards for the reproduction of records for security or with a view to the disposal of the original record.
The Division of Archives, History and Records Management has adopted rules concerning management of public records transferred to the archives, Chapter 1A-11, Fla. Admin. Code, but has not adopted rules of procedure for the destruction and disposal of agency records of no lasting significance. The Division's rules require only that each agency of state or local government provide "effective controls" for the management and "disposition" of agency records. Rule 1A-21.06, Fla. Admin. Code. The rules repeat the statutory prohibition of destruction or other disposition of public records without division approval. Rule 1A-21.05(1).
However apprehensive we may be of the logistical consequences, we recognize that the legislature is free to write the definition of public records and the proscription of their destruction as broadly as it wishes. Though Sections 119.011(1) and .041 may create paper mountains, stifle creative pencilwork and exhilarate warehousers, the legislature is entitled to put Florida on that course for good or ill. The consultant's handwritten notes of interviews and impressions are public records despite their form, because they were made "in connection with the transaction" of the public business contracted to the consultant. The papers received but not made by the consultant, including letters and resumes transmitted by prospects, were similarly "received ... in connection with the transaction of official business" which JEA employed the consultant to perform. The documents are public records within the definitional reach of Chapter 119.

III. The prospects' constitutional claims of a right of disclosural privacy

A.
The record before us shows that, under a bond of confidentiality, the consultant obtained and recorded on paper the following information concerning intervenor Doe and two other prospects whom we have identified in these proceedings as Roe and Jones.
John Doe. The notes concerning intervenor Doe, a ranking officer of a substantial utility, reveal his address, appearance, education, work experience, retirement prospects, professional associations, church and recreational associations, and drinking and smoking habits; his favorable comments on his wife's personality and her relationship to his career; and his impressions of himself, his mood and temper, his professional and personal aspirations, and his personal strengths and weaknesses. The consultant recorded Doe's psychological test results (in categories of mental, analytical and practical) and the interviewer's summary impressions of Doe, including "gentle, kind, soft, hesitant manner," "slow to develop confid," "unimpressive oral communicator," "reticent or slow," "high moral character," "late bloomer." There is also a typewritten resume *90 of Doe's personal, military, and professional life, prepared by Doe and marked "privileged and confidential  to be returned to owner after."
Richard Roe. The interview notes reveal Roe's address and information on his personal and professional life, education, military service, drinking habits, medications, hobbies, self-image ("square, loner  not with crowd"), his wife's education, personality and social activities, his children (one child is described as "lost sheep of family, wandering, dropped out of college  not dope"), his motivation, desire for self-improvement ("eat less fast, be instantly likable & charming, lose 20 #"), ideas for living his "life over" and psychological test results. There is a typewritten resume by Roe and a typewritten memorandum from one of the consultant's personnel to another, reflecting a favorable impression. A letter from Roe states:
It is absolutely essential that the information contained in this letter and resume, as well as all other correspondence with you, be kept confidential. I consider this information to be my personal property and if it were released to the public, it could cause irreparable harm to my professional career, particularly as it concerns my relationship with my present employer.
Public disclosure of this information could also decrease my effectiveness as a witness in hearings related to regulatory matters at the federal, state and local level.
The consultant's handwritten summary of "strengths" and "short-comings" include such characterizations as "mobilized," "animated," "good oral comm skills," "superior analytical capacity," "stammer," "stubborn," "can get upset," "compulsive need all be just so."
James Jones. The handwritten interview notes concerning Jones record information about his education and business experience, social affiliations, attitude toward his present position, physical condition, hobby, "life over" response, motivation, desired changes in himself, parents' personalities, test evaluations, children's ages, management experience ("had make tough, stern decis"), interest in other positions ("only reason to leave is to be head man"), and attitude toward public utilities ("I oppose it").
Thus these public records portray Doe, Roe, and Jones in intimate detail. The portraits are based on the prospects' own statements, induced by a promise of confidentiality, which reveal personal characteristics, relationships, thoughts, beliefs, and aspirations. The issue is whether, as a matter of constitutional law, the prospects are protected against general disclosure, for the edification of the public, of public records so constituted.

B.
The Bill of Rights of the United States Constitution and the Declaration of Rights of the Florida Constitution variously express our common conviction that the fundamental integrity of persons in their worship, their thoughts, their speech, their associations, their houses, their intimate personal relationships  in short, in the privacies of personhood  must not be violated by government except to vindicate compelling public interests.
Our understanding of constitutional protection is no longer fettered by nineteenth century doctrines which defended privacy only at the boundaries of private property.[5] Now, whether surrounded by palpable walls or not, zones of individual privacy are recognized as "implicit in the concept of ordered liberty"[6] and are constitutionally *91 protected as such. We have long understood that worship and speech are constitutionally protected, not only for their benefits to a democratic state,[7] but also because liberty in such matters is of the essence of personhood. We know now that the United States Constitution similarly protects privacy, another fundamental aspect of personhood, and that it does so without pretext.
Privacy rights are conceptually derived from several clauses of the Bill of Rights,[8] particularly as "one aspect of the `liberty' protected by the Due Process Clause of the Fourteenth Amendment."[9] A full categorical description of the protected zones of privacy is as yet impossible,[10] but the Supreme Court recognized in Roe v. Wade that persons enjoy a fundamental right of decisional autonomy, absent compelling state interests, in activities within the "protected intimate relationships"[11] of "marriage ... procreation ... contraception ... family ... and child rearing and education."[12] The Florida Supreme Court observed in 1977 that privacy rights in the sense of decisional autonomy have not been recognized outside Roe v. Wade's categorical relationships, Laird v. State, 342 So.2d 962, 965 (Fla. 1977);[13] but the United States Supreme Court recently cautioned that "the outer limits of this aspect of privacy have not been marked."[14]
We are not concerned here with an asserted privacy right in the sense of decisional autonomy in intimate conduct. Yet, though decisional autonomy and disclosural privacy are distinct enough in concept,[15] they unquestionably are related, and the decisional autonomy cases enlighten this one. Those cases teach that, in constitutional analysis, the forms and occasions of intimate association are not to be elevated over the inviolate intimacies of the person. To so elevate relationships at the expense of personhood would create new pretexts to replace the old one of property, which was discarded at some trouble. Intimate relationships *92 are not protected because those relationships are constitutional norms of life, but because they involve "matters so fundamentally affecting a person"[16] that government intrusion tends to debase personhood. Intimate relationships are not themselves the core of the right of privacy, either in its aspect of decisional autonomy or that of disclosural privacy.[17] At the core is the inviolability of personhood. The Supreme Court stated, in Eisenstadt v. Beard:
It is true that in Griswold [supra n. 8] the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.[18]
A fundamental aspect of personhood's integrity is the power to control what we shall reveal about our intimate selves, to whom, and for what purpose. That is the implication of both the Fourth and Fifth Amendments, which are directly concerned with involuntary disclosure:
[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection... . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.[19]
The privilege against self-incrimination ... reflects ... our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life... ."[20]
In its 1977 decision of Whalen v. Roe, the Supreme Court recognized, albeit with reservations appropriate to a case not requiring an unequivocal statement, that "the individual interest in avoiding disclosure of personal matters" is part of the privacy interest which is founded, as held in Roe v. Wade, in the Fourteenth Amendment's concept of personal liberty.[21] The Court quoted Professor Kurland's characterization of disclosural privacy as "the right of an individual *93 not to have his private affairs made public by the government."[22] Four months later, the Court decided Nixon v. Administrator of General Services,[23] and unequivocally held that former President Nixon is constitutionally protected in his "legitimate expectation of privacy" in presidential papers and tapes concerning "matters of personal life unrelated to any acts done in [his] public capacity." That protection was held to extend, "for example," to Mr. Nixon's private communications with Mrs. Nixon, their daughters, his "close friends," and in his personal diary.[24]

C.
The privacy issue is not entirely one of federal constitutional law. The Florida Constitution restates the fundamental guaranties of the United States Constitution which are associated with the right of privacy: the "inalienable rights" of persons, including the "right to enjoy and defend life and liberty, to pursue happiness," to worship and speak freely, to security against unreasonable searches and seizures, and to protection by due process against deprivation of life and liberty.[25] But the Declaration of Rights also contains, more explicitly than any clause of the United States Constitution, a guaranty of the right of disclosural privacy. Section 12 of the Declaration of Rights protects the "right of the people to be secure ... against the unreasonable interception of private communications by any means... ."
Florida courts have acknowledged the existence of a constitutional right of privacy, both in the sense of decisional autonomy, see Battaglia v. Adams, 164 So.2d 195 (Fla. 1964); Pasco v. Heggen, 314 So.2d 1, 4 (Fla. 1975); Jones v. Smith, 278 So.2d 339 (Fla. 4th DCA 1973), cert. denied, 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 573 (1974); and in the sense of disclosural privacy, see Hagaman v. Andrews, 232 So.2d 1, 6, 7 (Fla. 1970); In re Grand Jury Investigation, 287 So.2d 43, 47 (Fla. 1973). In Battaglia and Pasco the Supreme Court sustained the "absolute" and "natural and inherent" right of an individual to forbid the placing of his name on the ballot. The Court did not rule in constitutional terms, but nevertheless found that the right of privacy surpasses First Amendment voting rights. Hagaman acknowledged that the Declaration of Rights protects associational privacy. These decisions rest on the same considerations as the remarkably prescient Cason v. Baskin, 144 Fla. 198, 213, 20 So.2d 243, 250 (1945), which traced the right of privacy to the "life and liberty" protection of the Declaration of Rights.
Florida courts have demonstrated also that the constitutional protection against "unreasonable interception of private communications by any means" is not rooted in property concepts, such as might be offended only by penetrating wiretaps or unauthorized lifting of telephone receivers; it is rooted in the integrity of personhood. In Markham v. Markham, 265 So.2d 59 (Fla. 1st DCA 1972), affirmed, 272 So.2d 813 (Fla. 1973), this court suppressed wiretap evidence of a woman's telephone conversations, obtained by her husband and offered by him in a marriage dissolution proceeding. A statute proscribed the husband's conduct, but Judge Rawls' opinion was bottomed also on Florida's constitutional protection of private communications, concerning which he emphasized the wife's fundamental privacy right inherent in her personhood:
A married woman is no longer her husband's chattel. She is a citizen  she is an *94 individual  and her rights are as paramount as his. [265 So.2d at 62]
Our Supreme Court affirmed the judgment and approved Judge Rawls' reasoning based on "constitutional guaranties of the right to privacy"[26] arising from Article I, Section 12, of the Florida Constitution.
The Florida Supreme Court's decision in Shevin v. Sunbeam Television Corp., 351 So.2d 723 (Fla. 1977), was concerned with a statutory, not a constitutional, claim of privacy. Yet that decision similarly traces the right of disclosural privacy to its source in the essential integrity of personhood. The Court upheld, against a First Amendment challenge, a Florida statute which requires consent of all parties to private interception of their communication. The Court cited with evident approval Dietemann v. Time, Inc., 449 F.2d 245 (9th Cir.1971), which sustained a civil action against investigative reporters who secretly recorded the sound and sight of their interview with the claimant. Mr. Justice Adkins' opinion for the Court stated of Dietemann:
The court pointed out that a person should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording in full living color and hi-fi to the public at large. A different rule could have a most pernicious effect upon the dignity of man. [351 So.2d at 727.]
These words are consonant with the constitutional decisions of the United States Supreme Court, particularly Katz,[27] and with Markham's analysis of Article I, Section 12, of the Florida Constitution.
Thus the Florida Constitution expresses the theme that disclosural privacy  the personal right of some control over the broadcast of intimate information concerning the self  is an aspect of personhood which is to be protected, as are others, as fundamental. We are bound to decide this case in light of that constitutional theme.[28]

D.
An essential requisite of any constitutional claim of disclosural privacy is that the claimant have a "legitimate expectation of privacy" in the particular information or communication in danger of disclosure by state action. Nixon v. Administrator of General Services employed that phrase[29] to express a twofold requirement: first, that the claimant exhibited an actual or subjective expectation that the information would not be disclosed; and, second, that his expectation was one that society recognizes as "legitimate" or reasonable.[30] In this case, the prospects' communications to the consultant satisfy both requirements.
There is compelling evidence that the prospects talked to the consultant with a *95 firm understanding that the information they gave would be held in confidence and would not be publicly made known. The prospects may not have been so credulous as to expect that the interviewer would not repeat their information to anyone at all; they may have foreseen that the information would be discreetly discussed among the consultant's personnel and perhaps with selected JEA personnel. Yet, the prospects' privacy interests are not thereby obliterated, for "privacy is not just an absence of information abroad about ourselves; it is a feeling of security in control over that information."[31] That was the dispositive theme of both Katz and Sunbeam, which held that an individual's selective disclosure of information to another, who might repeat it, does not of itself imply consent that the conversation be "broadcast to the world" or "transmitted by photograph or recording in full living color and hi-fi to the public at large." The same reasoning apparently sustained the Supreme Court's protection of former President Nixon's constitutional claim of privacy in tape recordings of personal conversations with "close friends" in the Oval Office. In this case the consultant volunteered a promise of confidentiality, or the prospects extracted it as a condition of talking with the consultant. Their claim of a subjective expectation of privacy could not be stronger.
The prospects' expectation of disclosural privacy was also reasonable by objective standards. Much of the information recorded was highly personal and sensitive, and public revelation of it would be "offensive and objectionable to a reasonable man of ordinary sensibilities."[32]Roe v. Wade may suggest that the entries reflecting the prospects' intimate relationships  Doe's comment on his wife's personality, Roe's description of the "lost sheep" among his children, Jones' portrayal of his parents  should be regarded as the topmost of categories arranged in a descending order of sensitivity and constitutional interest. Arguably, the progressively lower tiers would include each prospect's beliefs and self-in-sights; his personal habits; routine autobiographical material; and finally, his name, address, marital status, and present employment, which together may constitute his irreducible identity to anyone who has reason to acknowledge his existence.
If the constitutional concern for privacy has its source in the inviolate aspects of personhood, it seems entirely artificial to attribute transcending importance to the prospects' statements concerning others in their families. Roe's "lost sheep" reference to his "wandering" son is not protected because we suppose it is a metaphorically accurate description of a family member; the characterization is protected, absent an overriding state interest, because it expresses the intimate feelings of Roe himself.[33] Roe's self-characterization as "square, loner *96  not with crowd," the other prospects' self-insights, and all their thoughts about reliving their lives are of the same order of sensitivity, and those entries are also presumptively protected against involuntary disclosure, though they do not implicate family members.
It is unnecessary to analyze in these terms the putatively intermediate categories of personal information, and the consultant's observations which were dependent on the information received. For even the facially least sensitive information recorded, which seemingly does not more than identify the prospects, receives greater import from the context: these persons were not identified for a statistical abstract or for other purposes insignificant to their privacy interests; they were identified as having interviewed the consultant at some length concerning a new job. The prospects believed that public revelation of that information would result in "dire consequences" to their professional lives. The consultant's testimony in the case attests that such concerns are genuine and widespread, though we may doubt that they are universal. The trial judge found that "significant damage may result" from public disclosure of the prospects' identities.
A substantial showing is thus made that public revelation of the prospects' identities, addresses, and basic family and vocational associations would be offensive to persons of ordinary sensibilities. Any doubt that might exist in other cases is dispelled by the additional circumstance in this case that the recorded information was imparted by the prospects themselves in response to express promises of confidentiality. The prospect's expectations of disclosural privacy in this information were legitimate by constitutional standards. See Wisher v. News-Press Pub. Co., 310 So.2d 345 (Fla. 2d DCA 1975), reversed on other grounds, 345 So.2d 646 (Fla. 1977); McLaughlin v. Philadelphia Newspapers, Inc., 465 Pa. 104, 348 A.2d 376 (1975).
We therefore conclude, under Constitutions that seek "to protect Americans in their beliefs, their thoughts, their emotions and their sensations,"[34] that the information given by the prospects and recorded in the consultant's papers is presumptively entitled to protection from public disclosure, and that it should be protected absent an overriding state interest.

E.
A state interest which is "compelling" must be held to override even privacy interests of constitutional dimensions, if that public interest cannot be fulfilled by less drastic or intrusive means. The analytical tasks of identifying and balancing "fundamental" personal interests, "compelling" public interests, and "less restrictive alternatives," are, for all their difficulty,[35] firmly rooted in United States Supreme Court decisions,[36] including the privacy decisions in Griswold, Eisenstadt, Roe v. Wade, Whalen, Carey, and Nixon.[37] Moreover, that kind of analysis is suggested in Florida Supreme Court decisions respecting "the constitutional (federal and state) right *97 to privacy." See In re Grand Jury Investigation, 287 So.2d 43, 47 (Fla. 1973) (a statutory "exception to a constitutional right... must be strictly construed and narrowly limited ... ."); and Hagaman v. Andrews, 232 So.2d 1 (Fla. 1970), in which associational privacy rights were held overridden by a compelling state interest in investigating the membership of The Governor's Club:
The interest of the Appellants in their associational privacy having been asserted, we have for decision the question of whether the public interest overbalances conflicting private ones... .
We cannot simply assume ... that every legislative investigation is justified by a public need that overbalances any private rights affected. To do so would be to abrogate the responsibility placed by the Constitution upon the Judiciary to insure that the Legislature does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty, his speech, or assembly, nor engage upon unwarranted witch hunts... . [232 So.2d at 7, 8.]
.....
[T]he giving of funds by individuals of wealth and by private associations to enforce some particular law or group of laws, which they single out from the great body of the statutes, is shocking to the law-abiding, public-spirited citizen. This is a subject of overriding and compelling state interest which may require legislative prohibition or regulation after an appropriate investigation... . [232 So.2d at 9, emphasis added.]
In general application, Florida's public records law and its companion, the open public meetings law, promote a state interest of the highest order. By promoting open government and citizen awareness of its workings, Chapter 119 and Section 286.011 enhance and preserve democratic processes.[38] Florida's interest in opening governmental processes to public inspection has repeatedly been emphasized in decisions of our Supreme Court. News-Press Publishing Co. v. Wisher, 345 So.2d 646 (Fla. 1977); Town of Palm Beach v. Gradison, 296 So.2d 473 (Fla. 1974); City of Miami Beach v. Berns, 245 So.2d 38 (Fla. 1971); Board of Public Instr. of Broward Co. v. Doran, 224 So.2d 693 (Fla. 1969).
When fundamental privacy interests secured by the due process clauses of the United States and Florida Constitutions are implicated, however, it is not enough that the statute generally serves a compelling interest in the disclosure of public records. There must be a compelling state interest in the public revelation of the particular information in which the prospects would otherwise enjoy privacy. To override constitutional privacy interests, a countervailing state interest must exist and be compelling at the point where those interests collide. When the public interest is not sufficiently compelling to override constitutional privacy interests in the particular information sought, an intrusive statute "must be narrowly drawn to express only the legitimate state interests at stake,"[39] or its general terms must be appropriately narrowed in judicial application.[40]
We hold that Florida has no compelling or overriding interest in exposing, for the edification of the public, the information in the consultant's papers. Two factors converge *98 in this case to deprive the public interest of all compelling urgency that may exist in other circumstances:
First, Doe, Roe, Jones and the others discussed in the consultant's papers were not JEA officials but were only prospects for employment when appellee Schellenberg presented his inspection demand to the consultant and to the circuit court, and so fixed the point of our inquiry. We recognize that the public's interest in such interview information is demonstrably greater when an agency seeks to employ a managing director than when it wishes to hire a clerk-typist. Yet even a President in office is "not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity." Nixon, 433 U.S. at 457, 97 S.Ct. at 2797, 53 L.Ed.2d at 900. We need not determine in this case the extent to which the privacy rights of agency officials must be subordinated to the state interest in the public revelation of records such as those of the consultant. In this case we need hold only that the privacy rights of one who is under consideration for public employment, but who has not agreed to serve, are not subordinated by the public interest to the same extent as those of one who has been chosen for or who publicly seeks employment. To the extent that there may be a compelling public interest in revealing intimate aspects of the personalities of unemployed prospects, or in revealing the nature of the interview process conducted by the consultant, we have served that interest by the less intrusive alternative of revealing in the public records of this court, and again in this opinion, all information in the consultant's papers which does not identify the prospects. In appropriate cases presented under Section 119.11, the courts of first instance may and should order such selective disclosure to accommodate both the public and the private interests involved.
And second, the consultant's explicit promise of confidentiality radically alters any compelling interest that Florida and its citizens may otherwise have had in the full public exploration of the consultant's papers. Both JEA, which advertised nationally for confidential inquiries to the consultant, and the consultant, which offered such assurances repeatedly, were agencies of the same state through whose offices public disclosure is now sought. See part I supra. Florida has no defensible interest in broadcasting, to the detriment of private citizens, expressions of their innermost thoughts which were induced by confidential assurances from a state agency.[41] The state insists on fair dealing from citizens who deal with the public; those citizens may also reasonably expect that the state will keep its word in accordance with the same minimum standards of good faith.[42] To expose the consultant's papers for general public rummaging would unacceptably compromise the integrity of both the state and these private citizens. The state is free to forbid its agents to offer or grant such promises of confidentiality, and may punish its agents when they disobey; but, when such promises are given, they markedly lessen any compelling interest which the state may otherwise have in revealing the information gained.
We must decline the Attorney General's invitation "to enunciate a public policy which prohibits, in the absence of statute, public funds to be expended for psychological *99 and personality employee screening." Such a declaration is beyond our power, and we should hesitate in any event to deprive public employers of interview methods which are widely employed in private industry to obtain employees suitable for sensitive tasks. Unless prohibited by law, agencies may acquire for evaluation such personal information as is here recorded. But, in that event, the state and its agencies may have a correlative duty to classify and protect from public exposure information which so compromises the personal integrity of employees. It should be noted that the Court's decisions in both Whalen and Nixon, sustaining statutory schemes for the collection or retention of sensitive information, turned on the adequacy of the state's "concern with, and protection of, the individual's interest in privacy."[43]
We therefore hold that, in the circumstances before us, public disclosure of the consultant's papers would unlawfully deprive the prospects of fundamental privacy interests which are among their liberties secured by the due process clauses of the United States and Florida Constitutions. Chapter 119 cannot lawfully be given that application. This case will be remanded to the circuit court with directions to return the papers in question to the consultant.
REVERSED AND REMANDED.
ERVIN, J., concurs.
BOYER, Acting C.J., concurs in part and dissents in part.
BOYER, Acting Chief Judge, concurring in part and dissenting in part.
I am in complete agreement with the result reached in the exhaustive and well reasoned opinion authored by Judge Smith. I disagree only with the conclusion that the hand written notes here involved are accorded the nomenclature of "records" to which the public record law applies. In so disagreeing I am not unaware of the broad language employed by the legislature in F.S. 119.011(1). However, legislative intent is a legitimate concern of courts in applying the literal words of a statute. The absurd ramifications recognized by Judge Smith himself in the foregoing opinion of attributing to the legislature the intent to apply the broad words of the statute to every piece of paper, celluloid and sound to which the words of the statute are susceptible of application requires an untenable and illogical construction. Literally construed, the statute would apply to doodlings and even the ordinary cassettes and tapes, customarily erased for reuse, employed in dictating equipment. The cost to the state  the taxpayers  would be incalculable and the size of jails would have to doubled. (See F.S. 119.10) No better argument for the unreasonableness of such an interpretation may be found than in the foregoing opinion itself. In my view, the legislature never intended such materials to be within the definition of "public records".
NOTES
[1] In News-Press Publishing Co. v. Wisher, 345 So.2d 646, 647 (Fla. 1977), the Supreme Court observed that "[a]ttempts to exclude constitutional considerations must fail so long as the general access question is involved." In that case the Court declined to consider the "difficult question of general access" in part because "[n]o employee is before us as a party to raise possible constitutional issues." Other courts have recognized the standing of surrogates such as the consultant to raise constitutional objections in behalf of persons such as the consultant's anonymous prospects. Carey v. Population Services Int'l, 431 U.S. 678, 684, n. 4., 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675, 684 (1977); Falcon v. Alaska Public Offices Comm'n, 570 P.2d 469, 475 (Alaska 1977); Industrial Foundation of the South v. Texas Industrial Accident Bd., 540 S.W.2d 668, 678 (Tex. 1976).
[2] See Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947, 962 (1968); Falcon v. Alaska Public Offices Comm'n, 570 P.2d 469, 474-75 (Alaska 1977). In Nixon v. Adm'r of Gen. Serv., 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court decided privacy claims of former President Nixon despite the Solicitor General's concession at oral argument that the claim was in certain respects wellfounded. See concurring opinion of Mr. Justice White, footnote, 433 U.S. at 488, 97 S.Ct. at 2811, 53 L.Ed.2d at 919-20.
[3] "[A]n appellate court does not lose jurisdiction of a cause even though the matter in controversy has become moot as to one or more of the litigants in cases involving wide public interest or where such matters involve the duties and authority of public officials in the administration of the law and are of general interest to the people."
[4] The consultant and JEA did not entirely preserve that bright-line conceptual distinction. Overlapping of roles occurred at the outset, when JEA's director of administration advertised in a national power magazine for confidential inquiries to the consultant. Later, the consultant arranged interviews between certain of its prospects, who were not then publicly declared candidates, and individual JEA members. During the search, the consultant orally reported impressions of various prospects to the JEA staff.
[5] See Note, Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L.Rev. 945, 948-64 (1977), which describes the judicial embodiment of privacy considerations in formal property concepts, resulting in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (upholding, 5-4, wiretaps on exterior telephone lines).
[6] Roe v. Wade, 410 U.S. 113, 152-53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147, 176-77 (1973). The quoted phrase appeared first in Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937).
[7] Concerning the undeniable benefits to the state, see, e.g., Justice Terrell's passionate defense of religious freedom in State ex rel. Singleton v. Woodruff, 153 Fla. 84, 87, 89, 13 So.2d 704, 705-06 (1943):

A liberated conscience is as essential to a robust democracy as blood is to the human body. Enslave the conscience and democracy will perish as certainly as the body will perish when the blood ceases to circulate.
Justice Terrell would surely agree that "a liberated conscience" is to be protected for its own sake, not simply for the state's. He would remind us that man was not made for the state; that the state, like the Sabbath, was made for man.
[8] Roe v. Wade traced the derivation from the First, Fourth, Fifth, Ninth, and Fourteenth Amendments and from "the penumbras of the Bill of Rights" described in Griswold v. Connecticut, 381 U.S. 479, 484-85, 85 S.Ct. 1678, 1681-82, 14 L.Ed.2d 510, 514-15 (1965). 410 U.S. at 152, 93 S.Ct. at 726, 35 L.Ed. at 176.
[9] Carey v. Population Services International, 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675, 684 (1977).
[10] Paul v. Davis, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405, 421 (1976).
[11] So characterized in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 66 n. 13, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446, 462 (1973).
[12] Roe v. Wade, 410 U.S. at 152-53, 93 S.Ct. at 726, 35 L.Ed.2d at 176-77 (citations omitted).
[13] See also Miami Herald Pub. Co. v. Marko, 352 So.2d 518 (Fla. 1977), holding that policemen have no constitutional right of privacy in critical statements made by others concerning them in a grand jury presentment. The Court again noted that the privacy right "has generally been narrowly confined to matters of marital intimacy, procreation and the like." 352 So.2d at 520, n. 4. But see In re Grand Jury Investigation, 287 So.2d 43, 47 (Fla. 1973); Hagaman v. Andrews, 232 So.2d 1, 7 (Fla. 1970).
[14] Carey, 431 U.S. at 684, 97 S.Ct. at 2016, 52 L.Ed.2d at 684.
[15] Whalen v. Roe, 429 U.S. 589, 598-99, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, 73 (1977) distinguished "at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." (footnotes omitted) See also Bazelon, Probing Privacy, 12 Gonzaga L.Rev. 587, 604 et seq. (1977); Silver, The Future of Constitutional Privacy, 21 St. Louis U.L.J. 211, 270 (1977).
[16] Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349, 362 (1972). The Court later stated that the protection afforded familial relationships extends outside the home "to the doctor's office, the hospital, the hotel room, or as otherwise required to safeguard the right to intimacy involved," Paris Adult Theatre, I, supra n. 11 (emphasis added). Still later Carey interpreted prior decisions as protecting "the most intimate of human activities and relationships." 431 U.S. at 685, 97 S.Ct. at 2017, 52 L.Ed.2d at 685 (emphasis added).
[17] The Florida Supreme Court noted in Laird, 342 So.2d at 964, that certain privacy rights exist "outside of personal relationships." Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).
[18] Eisenstadt, 405 U.S. at 453, 92 S.Ct. at 1038, 31 L.Ed.2d at 362 (1972) (emphasis by the Court).
[19] Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967); see also Boyd v. United States, 116 U.S. 616, 628, 6 S.Ct. 524, 531, 29 L.Ed. 746, 750 (1886); Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, 1785 (1949).
[20] Murphy v. Waterfront Comm'n of New York Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596-97, 12 L.Ed.2d 678, 681 (1964), quoting Judge Frank's dissent in the United States v. Gruenewald, 233 F.2d 556, 581-82 (2d Cir.1956), reversed, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).
[21] Whalen v. Roe, supra n. 15. Justice Stevens' opinion for the Court took pains to avoid declaring disclosural privacy a fundamental right under the Constitution, and stated only that government's duty to protect information in its possession "which is personal in character and potentially embarrassing or harmful if disclosed" is a duty that "arguably has its roots in the Constitution... ." 429 U.S. at 605, 97 S.Ct. at 879, 51 L.Ed.2d at 77. In an address given immediately after Whalen was announced, but before Nixon v. Administrator of General Services was decided, one noted commentator stated that "the Supreme Court does not yet appear ready to grant that status [a fundamental right] to informational privacy." Bazelon, supra n. 15, at 614.
[22] 429 U.S. at 599, n. 24, 97 S.Ct. 876, 51 L.Ed.2d at 73.
[23] 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).
[24] 433 U.S. at 458-59, 97 S.Ct. at 2798, 53 L.Ed.2d at 901. It was unnecessary for the Court to distinguish between private communications and private communications of "historical interest," because the United States conceded that all such material should be turned over to Mr. Nixon. The difficulty of such distinctions is exhibited, however, in Justice White's concurring opinion. See footnote, 433 U.S. at 488, 97 S.Ct. at 2811, 53 L.Ed.2d at 919.
[25] Article I, Sections 2, 3, 4, 9, 12, Florida Constitution.
[26] 272 So.2d at 814. The Supreme Court's approval of the Rawls opinion and its characterization of the wife's constitutional "right of privacy" are the more significant because the three opinions written in this court offered a full range of choices. Judge Carroll concurred in the result on purely statutory grounds. Judge Wigginton dissented, emphasizing the husband's property interests in the telephone equipment and his personal interests, transcending the wife's, as "head of his household."
[27] "One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." 389 U.S. at 352, 88 S.Ct. at [511-12, 19 L.Ed.2d at 582.
[28] Katz, supra n. 19, recognized that the federal Constitution does not entirely occupy the privacy field:

[T]he protection of a person's general right to privacy  his right to be let alone by other people  is, like the protection of his property and of his very life, left largely to the law of the individual States.
389 U.S. at 350-51, 88 S.Ct. at 510-11, 19 L.Ed.2d at 581 (footnotes omitted).
[29] 433 U.S. at 458, 97 S.Ct. at 2797, 53 L.Ed.2d at 900.
[30] Katz implied the twofold requirement in recitals (1) that Katz made the telephone call in circumstances indicating his personal expectation that it would be "preserve[d] as private, even in an area accessible to the public," and (2) that Katz "was surely entitled to assume" that his words would not be "broadcast to the world." 389 U.S. at 352, 88 S.Ct. at 511-12, 92 L.Ed.2d at 582. Justice Harlan's concurring opinion made the point explicitly. 389 U.S. at 361, 88 S.Ct. at 516-17, 19 L.Ed.2d at 488.
[31] Freid, Privacy, 77 Yale L.J. 475, 493 (1968). See also Lusky, Invasion of Privacy: A Clarification of Concepts, 72 Colum.L.Rev. 693, 709 (1972): "Privacy is the condition enjoyed by one who can control the communication of information about himself." The personal and societal stakes in limited and protected communication are most searchingly analyzed in A. Westin, Privacy and Freedom (1967).
[32] W. Prosser, Law of Torts § 117 at 811 (4th ed.). See also Cason v. Baskin, 155 Fla. 198, 215, 20 So.2d 243, 251 (1945). Common Law concepts cannot be transported uncritically into the Florida or Federal Constitution, for the public records law evidences a purpose to occupy the entire field of nonconstitutional policy as perceived at common law. State ex rel. Veale v. City of Boca Raton, 353 So.2d 1194 (Fla. 4th DCA 1978). Where the legislation fulfills a compelling state interest, it must be given effect even over fundamental personal interests. Part III.E., infra. But Prosser's formulation is useful in identifying fundamental interests in disclosural privacy, and its influence echoes in Nixon and other decisions constitutionally validating particular expectations of privacy in selective disclosure. Prosser's standard is explicit in some decisions. E.g., Falcon v. Alaska Public Offices Comm'n, 570 P.2d 469, 479 (Alaska 1977), quoting Leigh, Informational Privacy, 3 Hastings Const.L.Q. 229, 251 (1976): "Sensitive information is that which a person desires to keep private and which, if disseminated, would tend to cause substantial concern, anxiety or embarrassment to a reasonable person" (citing Prosser).
[33] "A record of one's private beliefs and emotions tells a good deal about a person. Similarly, when one intimately and privately shares such thoughts and feelings with others he reveals much of the inner person he is." Note, supra note 6 at 986.
[34] Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Justice Brandeis, dissenting); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542, 549 (1969).
[35] The Note at 57 Boston U.L.Rev. 462 (1977) is a valuable primer on this emerging aspect of substantive due process. Penetrating criticism of it is found in Wellington, Common Law Rules and Constitutional Double Standards: Some Notes on Adjudication, 83 Yale L.J. 221, 299, et seq. (1973); and Perry, Substantive Due Process Revisited: Reflections on (and Beyond) Recent Cases, 71 Northwestern U.L.Rev. 417, 420-22 (1976).
[36] E.g., Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292 (1937); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942); Bates v. Little Rock, 361 U.S. 516, 523-24, 80 S.Ct. 412, 416-17, 4 L.Ed.2d 480, 485-86 (1960).
[37] Nixon concerned the constitutionality of governmental intrusion on the former president's privacy in taped conversations of personal rather than national or historical interest. By the questioned statute, archivists were to cull, from 43 million documents and 880 tape recordings, communications in which Mr. Nixon had a "constitutionally based right or privilege" against disclosure. The limited intrusion of the culling process was the matter in issue. Though the Court did not explicitly label the culling interest "compelling," that preliminary finding is necessarily implied by the Court's reference to the "unavailability of less restrictive means" of respecting privacy interests while identifying nonprotected material. See text and fn. 25, 433 U.S. at 464, 97 S.Ct. 2800, 53 L.Ed.2d at 904.
[38] The state's interest in securing the processes of representative democracy is as compelling an interest as that of government security. See Note supra n. 35, 57 Boston U.L.Rev. at 480-82, and cases cited. See also Bazelon, supra n. 15 at 594-96.
[39] Roe v. Wade, 410 U.S. at 155, 93 S.Ct. at 728, 35 L.Ed.2d at 178; Eisenstadt, 405 U.S. at 463, 92 S.Ct. at 1043, 31 L.Ed.2d at 368 (White, J., concurring in result), Carey, 431 U.S. at 688, 97 S.Ct. at 2018, 52 L.Ed.2d at 687.
[40] Corn v. State, 332 So.2d 4 (Fla. 1976); White v. State, 330 So.2d 3 (Fla. 1976); State v. Beasley, 317 So.2d 750 (Fla. 1975); State v. Ecker, 311 So.2d 104 (Fla. 1975), cert. denied sub nom. Bell v. Florida, 423 U.S. 1019, 96 S.Ct. 455, 46 L.Ed.2d 391 (1975). See also Robinson v. Reed, 566 F.2d 911 (5th Cir.1978).
[41] Browning v. Walton, 351 So.2d 380 (Fla. 4th DCA 1977), is not to the contrary. There the agency's assurance of confidentiality did not induce its employees to give the information sought by the action; and the information sought was simply the names and addresses of employees.
[42] See Daniell v. Sherrill, 48 So.2d 736, 739 (Fla. 1950), and authorities cited; Fullard v. State, 352 So.2d 1271 (Fla. 1st DCA 1977); McLaughlin v. Philadelphia Newspapers, Inc., 465 Pa. 104, 348 A.2d 376 (1975); and the three-judge district court's decision in Nixon v. Administrator of General Services, 408 F. Supp. 321, 359 (D.C.D.C. 1976), which attributed more "constitutional difficulty" to the Act's screening process because the Act was retroactive. The court's observations, which were not inconsistent with the Supreme Court's later decision, emphasize that, in the privacy context as well as others, the due process clause requires fairness in the assertion of public interests which are thought to subordinate private liberties.
[43] Whalen, 429 U.S. at 605, 97 S.Ct. at 879-80; 51 L.Ed.2d at 77; Nixon, 433 U.S. at 464, 97 S.Ct. at 2801, 53 L.Ed.2d at 904-05.